16 CV 0861

JUDGE CARTER

Michael J. Frevola
Marisa A. Marinelli
Christopher R. Nolan
F. Robert Denig
HOLLAND & KNIGHT LLP
31 West 52nd St.
New York, NY 10019
Telephone: (212) 513-3200
Telefax: (212) 385-9010
michael.frevola@hklaw.com
marisa.marinelli@hklaw.com
christopher.nolan@hklaw.com
robert.denig@hklaw.com

ATTORNEYS FOR PLAINTIFF
COMMODITIES & MINERALS ENTERPRISE LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITIES & MINERALS ENTERPRISE LTD.. <br><br> Plaintiff, <br><br> -against- <br><br> CVG FERROMINERA ORINOCO, C.A., <br><br> Defendant. | Civil Action No. <br><br> **VERIFIED** <br> **COMPLAINT** |

Plaintiff, Commodities & Minerals Enterprise Ltd. ("CME"), respectfully submits this Complaint against Defendant CVG Ferrominera Orinoco, C.A. ("FMO" or "Defendant") and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action arising out of a group of contracts between Plaintiff CME and Defendant FMO, all of which relate to CME's provision of financing, equipment, and services to FMO in connection with FMO's iron ore mining and sales operations in the Guayana region of Venezuela.

2.      Specifically, FMO contracted with CME for CME to provide an extensive list of services to FMO, including but not limited to: (a) organizing, managing and operating a series of operations necessary to transfer the iron ore from FMO's mines to international markets (the "Transfer System Contract"), (b) providing vessels for the maritime transportation portion of the Transfer System (the "Charters"), and (c) supplying numerous goods and supplies to FMO to upgrade and modernize FMO's iron ore operations (collectively all of CME's contracts with FMO will be referred to herein as "the Contracts").

3.      As discussed in greater detail below, due to FMO's cash-poor situation, CME agreed to accept iron ore at an agreed dollar value per metric ton as substitute payment for funds owed under the Contracts.

4.      Since 2011, the situation with FMO, and with Venezuela in general, has grown increasingly worse.  Despite CME's efforts to work with FMO, FMO's cash flow became an ever increasing problem and that, in turn, impacted production.  As a consequence, FMO provided CME with much less iron ore than was required to cover the amounts FMO owed CME under the various Contracts.  Nevertheless, CME continued to honor the Contracts.

5.      Despite CME's assistance to FMO, FMO did not perform its obligations in return. Frequently, the material produced, which production CME helped facilitate and which should have been provided to CME, instead was supplied to others.  Not only did FMO prefer other

customers over CME, but the circumstances of some of these other transactions has led CME to question the legitimacy of those transactions.

6.        Finally, drastic changes in Venezuela in early 2013 made CME's situation untenable.  The Venezuelan military assumed management of FMO and other companies and proceeded to make serious allegations against a number of companies contracted by FMO.  With respect to CME, FMO's new management claimed that the Contracts violated Venezuelan law.

7.        As a result of these accusations, the Venezuelan military refused to supply any more iron ore to CME.  Consequently, the vessel that CME currently had on charter to FMO – the *M/V GENERAL PIAR* – was redelivered to CME well before the end of its five year charter term.

8.        As part of FMO's attempts to discredit and intimidate CME, FMO made criminal accusations against the directors and management of CME.  FMO caused an arrest proceeding to be instituted against CME's Chairman, Tyrone Serrao, claiming that he had committed criminal actions by damaging the patrimony of the country.  In order to prove the legality of its contracts with FMO, and to prove that no criminal action had been committed, CME began legal proceedings in Venezuela.  Recently, CME obtained a declaratory judgment from a Venezuelan court declaring that the Contracts did not violate Venezuelan Law.   The process took approximately two years over strenuous opposition by FMO.

9.        Among the various Contracts, two were maritime contracts containing U.S. choice of law clauses, with one providing for New York arbitration under the Rules of the Society of Maritime Arbitrators, Inc. ("SMA Rules") and the other providing for Miami arbitration under the SMA Rules (the "U.S. Maritime Contracts").  CME will be commencing arbitration proceedings regarding the U.S. Maritime Contracts claims immediately after the

attachment order requested in this matter has been issued and has been served on the designated garnishees.  As explained below, the total amount owed to CME under the U.S. Maritime Contracts is $238,668,635.34.  CME seeks an order pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure ("Rule B") directing the maritime attachment of property in which FMO has an interest located in this District up to an amount of $238,668,635.34 as security for its U.S. Maritime Contracts claims.

10.    In addition, another set of contracts were vessel charters for the vessels *M/V PALINI*, *M/V TAIGLAD*, *M/V W.H. BLOUNT*, and *M/V GYPSUM INTEGRITY*, which charters have English law and London arbitration provisions (the "English Charters").  CME will be commencing arbitration proceedings in London regarding the English Charters shortly after the attachment order requested in this matter has been issued and has been served on the designated garnishees.  As explained below, the total amount owed to CME under the English Charters is $4,982,498.41.  CME seeks an order pursuant to Rule B directing the maritime attachment of property in which FMO has an interest located in this District up to an amount of $4,982,498.41 as security for its English Charters claims.

11.    The various Contracts between CME and FMO also included a contract for supply of railway wagons to FMO (the "Wagons Contract"), which Wagons Contract provides for arbitration in Zurich, Switzerland under the Rules of the International Chamber of Commerce. CME will be commencing arbitration proceedings regarding the Wagons Contract claims shortly after the attachment order requested in this matter has been issued and has been served on the designated garnishees.  As explained below, the total amount owed to CME under the Wagons Contract is $30,153,490.36. Pursuant to Article 75 of New York's Civil Practice Law and Rules,

CME seeks an attachment of property in which FMO has an interest in an amount of at least $30,153,490.36 as security for its Wagons Contract claims.

## JURISDICTION

12.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves the breach of the U.S. Maritime Contracts, which contracts are described below in detail.  This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration.

13.    This Court also has supplemental jurisdiction over the Wagons Contract claims pursuant to 28 U.S.C. § 1367(a).

## FACTUAL BACKGROUND

**The Parties**

14     CME is in the business of trading commodities and minerals, particularly iron ore. CME obtained its iron ore supply from FMO through the Contracts.  CME largely sells to customers in China, but it also has provided shipments to the European and American markets. CME is a company organized and existing under the laws of the British Virgin Islands since September 1, 2005.  Prior to its corporate institution in the British Virgin Islands, a corporate predecessor to CME, also named Commodities and Minerals Enterprise LTD, did business as a Swiss corporate entity ("CME Swiss").  All of the contractual rights and obligations of CME Swiss were transferred to plaintiff CME, the British Virgin Islands entity, in May of 2008.  CME notified FMO of this change over, and FMO and CME continued to perform under contracts that were entered into between FMO and CME Swiss.  CME Swiss is no longer in existence.

15.    Defendant FMO is a company organized and existing under the laws of the Bolivarian Republic of Venezuela.

**CME's Venezuelan Iron Ore Project**

16.     When CME began trading iron ore in 2004 after its founding, CME's transactions with its Venezuelan supplier FMO were simply buy/sell transactions.  Over time, however, the economic situation in Venezuela deteriorated.  FMO suffered severe cash flow problems, affecting its operations, including but not limited to its production capacity.

17.     As a result of the Venezuelan economic deterioration, CME worked with FMO and adapted its business operation so that it would supply FMO with equipment and spares required by FMO under a barter arrangement (i.e., CME would provide equipment and spares to FMO in exchange for iron ore and derivative iron products).  Under this arrangement, CME was involved with a number of projects, including supplying FMO with a ship loader, a wagon tilter and a stacker.  CME supplied over one thousand railway wagons to FMO, which are used for transporting material by rail from the mine to the production plant.  Several of these projects are described in greater detail below.

**The Transfer System**

18.     To better understand CME's allegations in this Verified Complaint, it will be useful to have a general understanding of what is referred as the "Transfer System," its components, and how it works.  The Transfer System is the means by which FMO delivers its iron ore, mined in the interior of Venezuela, to large bulk carrier export vessels, which then transport the iron ore to customers and end users around the world.

19.     At all times relevant to this Verified Complaint, FMO transported iron ore from its mines to inland ports approximately 180 miles up the Orinoco River, namely Puerto Ordaz and Palua (the "Inland Ports").  Export vessels, which tend to be large "capesize" vessels, cannot safely navigate the Orinoco River because of draft restrictions.  Hence, FMO used smaller Panamax and Handymax vessels as "shuttle vessels" to transport the ore from the Inland Ports to

an offshore transfer station located in deep water off the Venezuelan coast. The offshore transfer station is a converted self-unloading "baby capesize" vessel named the "*M/V BOCA GRANDE II*," which is permanently moored several miles off the mouth of the Orinoco River in Venezuelan waters. The *M/V BOCA GRANDE II* commonly is called the "Transfer Station" because of the role it plays in the Transfer System. Large bulk carrier export vessels then load iron ore directly from the Transfer Station.

20. At all times relevant to this Verified Complaint, FMO owned all of the components of the Transfer System, which consisted of: (1) the Transfer Station, (2) two shuttle vessels, the *M/V RIO CARONI* and the *M/V RIO ORINOCO*, (3) a ship loader and conveyor system that transports the iron ore from the stockpile to shuttle vessels, and (4) the Punta Barima pilot station. On occasion as needed, FMO also would charter additional shuttle vessels (such as the *M/V GENERAL PIAR* and the vessels hired under the English Charters) to operate as part of the Transfer System, which vessels FMO did not own.

21. The U.S. Maritime Contracts – under which the bulk of CME's claims arise – consist of two contracts related to the Transfer System. The first is a time charter party, by the terms of which CME chartered to FMO the *M/V GENERAL PIAR* to act as a shuttle vessel in the Transfer System (the "*GENERAL PIAR* Charter"). The second is the Transfer System Management Contract ("TSMC") whereby CME agreed to manage, operate, and maintain the entire Transfer System for FMO. Both of these contracts will be explained in greater detail below.

22. Similarly, the English Charters relate to the Transfer System as they involve additional vessels chartered to act as shuttle vessels in the Transfer System. They likewise will be discussed below.

**CME's Contractual Relationship with FMO**

*The 2004 Iron Ore Sales Contract*

23.     In 2004, CME entered into a contract with FMO for the sale and purchase of Venezuelan iron ore (the "2004 Iron Ore Sales Contract"), whereby FMO agreed to sell to CME certain quantities of various iron ore products for a period from January 2005 through December 2009.  Pursuant to that contract, FMO was to deliver iron ore to CME at Puerto Ordaz in Venezuela, or at the Transfer Station, or by transshipment in Venezuelan waters, at which points the iron ore would be loaded on board ships for delivery to CME's customers.

24.     From 2004 onwards, FMO was CME's only source of iron ore.  CME would market and sell the iron ore it purchased from FMO mostly in China, but also in Europe and the U.S. on occasion.

25.     The 2004 Iron Ore Sales Contract was a U.S. dollar contract, meaning that pursuant to its terms, FMO was to invoice CME, and CME was to pay FMO, in U.S. dollars.  As contemplated by the parties, adjustments to the price and quality of the iron ore to be delivered by FMO were made from time to time through mutually-agreed amendments to the 2004 Iron Ore Sales Contract.  But, at all times, the iron ore sold to CME under the 2004 Iron Ore Sales Contract was sold in U.S. dollars.

26.     During the course of performance of the 2004 Iron Ore Sales Contract, FMO often was short of cash and had difficulty maintaining a steady output of iron ore from its mines. In order to maintain its supply of iron ore to its customers, on several occasions CME provided financial support to FMO in the form of providing funding, works, goods and services to support FMO's mining operations.  In return for CME's support, FMO would compensate CME with iron ore at an agreed price per metric ton.

27.    For example, in 2008 FMO sought to install an iron ore stacking system to increase its output of iron ore.   CME agreed to manufacture, supply, and supervise the installation of the stacking system for FMO for an agreed price.   In return, FMO agreed to compensate CME with iron ore worth the amount of that agreed price based on the pricing formula established in the 2004 Iron Ore Sales Contract.

### The Framework Agreement Between CME and CVG

28.    During this period when FMO and CME were performing under the 2004 Iron Ore Sales Contract, CME and the Venezuelan government became interested in re-opening an iron ore mine named Cerro Bolivar.   The Cerro Bolivar mine had been inactive since 1997 because the high phosphorous and silica content in the mine's ore made it commercially impossible to sell.   CME, however, had customers that were interested in the high impurity ore. CME brought this opportunity to the Venezuelan Corporation of Guayana ("CVG"), FMO's parent corporation, and in 2008 CME began discussions with CVG about reopening the Cerro Bolivar mine.

29.    CVG estimated that reopening the Cerro Bolivar mine would require a substantial investment.   It was contemplated that CME would make that investment to reopen the mine by entering into various contracts with FMO to provide goods and services to FMO for its operation of the mine, which would be under a legal framework to be established.   Again, as consideration for CME's efforts in this project, CME would be compensated in iron ore.

30.    In January 2009, CME entered into an agreement with CVG (the "Framework Agreement") whereby both parties agreed to undertake certain activities necessary to reactivate production from the Cerro Bolivar mine.   Under the terms of the Framework Agreement, in return for CME's substantial  investment to reopen the Cerro Bolivar mine, CVG guaranteed that

CME would receive from FMO up to three million metric tons of iron ore per year for each year of the Framework Agreement's ten year term (i.e., a total of thirty million metric tons of iron ore).

### The Vessel Charters

31.     During this same time period (the end of 2009 and beginning of 2010), CME also began chartering vessels on FMO's behalf when such vessels were needed to perform shuttling services from Puerto Ordaz to the Transfer Station.   CME would enter into charter party agreements with the owners of the shuttle vessels and then in turn, sub-charter those vessels to FMO.

32.     In January 2010, CME and FMO entered into the *GENERAL PIAR* Charter whereby CME chartered the *M/V GENERAL PIAR* to FMO for a term of 60 months at a rate of $35,000 per day, with the daily charter hire rate to increase each year as per the parties' agreement.   The *GENERAL PIAR* Charter contains the New York arbitration clause, which provides that arbitration is to be conducted under the SMA Rules under "the Maritime Law of the United States."   The *M/V GENERAL PIAR* was to be used by FMO principally as a shuttle vessel transporting iron ore from Puerto Ordaz to the Transfer Station.

33.     The English Charters were entered between CME and FMO on the dates, hire rates, and time periods indicated for each vessel: *M/V PALINI* (Sept. 26, 2009 at $35,000/day for up to 4 months), *M/V TAIGLAD* (Sept. 26, 2009 at $34,000/day for up to 4 months), *M/V W.H. BLOUNT* (Feb 21, 2010 at $35,000/day for 11 months), and *M/V GYPSUM INTEGRITY* (Jan. 26, 2011 at $37,000/day for 3 months).   The English Charters each contain a London arbitration clause, which provides that arbitration is to be conducted in accordance with English law.   The

vessels chartered under the English Charters were to be used by FMO principally as shuttle vessels transporting iron ore from Puerto Ordaz to the Transfer Station.

### The Transfer System Management Contract

34.     In August 2010, CME entered into the TSMC with FMO for the management of the entire Transfer System.  Pursuant to the TSMC, CME was to maintain, manage, and operate the Transfer System for a term of 5 years, to be automatically renewed for an additional 5 years unless terminated by either party.  The TSMC placed upon CME responsibility for, *inter alia*, the following operations: (a) the loading of the shuttle vessels at the Inland Ports through a system of conveyors and a ship loader, (b) the carriage of the iron ore loaded in the shuttle vessels from the Inland Ports to the Transfer Station offshore, (c) the operation and maintenance of the Punta Barima pilot station (used by the vessel pilots for the Orinoco River and Transfer Station), (d) the transshipment of the iron ore from the shuttle vessels to the Transfer Station, and (e) the loading of the large bulk carrier export vessels from the Transfer Station.  The Transfer System was to have a minimum throughput of 6,000,000 metric tons of iron ore from FMO's mines per calendar year for the duration of an initial 5 year term of the TSMC.

35.     Under the terms of the TSMC, CME was to receive as payment from FMO compensation based on a processing rate of a minimum of 500,000 metric tons of iron ore per month, which payments would be made in accordance with the existing 2004 Iron Ore Sales Contract.  CME was to invoice FMO at the beginning of each month in advance in a sum equal to processing 500,000 metric tons of iron ore at an agreed-upon rate under the TSMC.  At various times during the performance of the TSMC, CME and FMO agreed to price adjustments to the iron ore processing rate.  Regardless of the processing rate, which governed at the

particular time, CME invoiced FMO for the amounts due under the TSMC in U.S. dollar amounts each month in advance.

36.    The parties continued their discussions about reactivating the Cerro Bolivar mine throughout 2010.   It was determined that the reactivation of the mine would require the implementation of a set of projects to construct plants and facilities and repair the equipment to allow for the sustainable increase of production activities and the transportation of iron ore.

### *Commercial Alliance Agreement*

37.    In December 2010, CME and FMO entered into a commercial alliance agreement (the "Commercial Alliance"), by which terms CME was to provide the financial support to reactivate the Cerro Bolivar mine by financing construction projects, acquiring assets, and rendering services that would facilitate FMO's production and supply of the iron ore.

38.    The Commercial Alliance was intended to complement the provisions of the Framework Agreement.   Under the Commercial Alliance, CME and FMO were to enter into separate "development contracts" for the projects and services required to support FMO's operations.   The Commercial Alliance agreement set forth certain terms and procedures with which each development contract would have to conform, as well as certain contracts that already had been entered into between CME and FMO for the purposes of supporting FMO's production and commercialization of iron ore (such as the TSMC).   It was contemplated in the Commercial Alliance, however, that each development contract would be negotiated separately and represented a distinct legal transaction between FMO and CME with its own independent obligations.

### The 2012 Iron Ore Sales Agreement

39.    In May 2012, CME and FMO entered into a second iron ore sales agreement (the "2012 Iron Ore Sales Agreement"), pursuant to which FMO agreed to sell and deliver to CME certain specified amounts of designated iron ore products.  The amounts to be delivered to CME under the 2012 Iron Ore Sales Contract were offered by FMO in consideration for CME's performance of certain activities and operations described in Annex C of the 2012 Iron Ore Sales Agreement for the purpose of increasing FMO's production capacity.  For example, pursuant to Annex C of the 2012 Iron Ore Sales Agreement, CME took responsibility on behalf of FMO for the financing of the construction of the PTLBII Crushing and Screening Plant, which would increase FMO's production capacity.  In return, FMO was to provide CME with iron ore under the terms of the 2012 Iron Ore Sales Contract.

### The Wagons Contract

40.    In July 2012, CME and FMO entered into a contract for the sale and purchase of railway wagons, whereby CME was to sell and deliver to FMO a number of hopper railcars for the transportation of FMO's iron ore (the Wagons Contract).   The collective price for this purchase was US$35,000,000.  As with the other contracts for goods and services between CME and FMO, it was contemplated that FMO would pay CME for the railway wagons with the equivalent U.S. dollar value of iron ore products.

41.    While an understanding of each of the contracts described above is important, to understand the relationship between CME and FMO, CME's claims in this Verified Complaint arise under the TSMC, the *GENERAL PIAR* Charter, the English Charters, and the Wagons Contract only.

**FMO's Failure to Perform and the Resulting Financial Imbalance**

42.    As the foregoing is intended to demonstrate, the contractual relationship between CME and FMO is complex.  It involves many interrelated, but independent, contracts.  In general terms, however, the nature of the CME/FMO relationship evolved into an alliance whereby CME would provide various forms of financing, goods, and services for the cash-poor FMO, in return for which CME would receive the U.S. dollar cash equivalent in iron ore products.  Generally speaking, CME would invoice FMO for services it provided under the various Contracts described above, and FMO would invoice CME for the iron ore products it provided to CME.[1] FMO, however, as of 2010 onwards, never provided to CME any amounts of iron ore as a specific payment for any of CME's invoices.  Rather, the parties monitored their respective financial positions as the Contracts were performed and invoices were generated.  In the case of CME's services to FMO over the course of the last several years, there are literally hundreds of invoices related to those services.  In theory, if the system worked as contemplated by the parties, the total amount of CME's invoices for amounts owed to it by FMO would balance the total amount of FMO's invoices for amounts owed to it by CME.  This, however, was not to be.

43.    Throughout CME's and FMO's contractual relationship, it was common for CME to be in the financial position where FMO owed to CME substantial sums.  FMO often would provide iron ore to its other customers in preference over CME.  In the early years of the process, however, FMO would reduce the imbalances and the parties' respective financial positions would be close to even.  Ultimately, however, the total amount of CME's invoices for amounts

---

[1] Due to Venezuelan laws and regulations, some of the services provided by CME to FMO in Venezuela under the Contracts had to be performed by a Venezuelan corporation and invoiced in the Venezuelan currency (Bolivars). Thus, to comply with Venezuelan law, the work under the Contracts subject to these laws and regulations was performed and invoiced by CME's agent in Venezuela, Agentes Y Representantes Industriales Venezolanos, C.A. ("Arivenca").  These amount due and owing to Arivenca, however, were ultimately due and owing to CME.  Thus, for the purposes of this Verified Complaint, CME does not distinguish between invoices issued by CME and Arivenca.

owed to it by FMO far exceeded the total amount of FMO's invoices for amounts owed to it by CME.

44.     The imbalance between CME and FMO started to snowball in 2011.  As 2011 progressed, the difference between the parties' financial positions mounted as the amount of iron ore FMO provided to CME on a monthly basis began to decrease substantially.  This exacerbated the financial imbalance between the parties, but CME continued to faithfully perform its obligations under the various Contracts, and specifically it continued to perform its obligations under the *GENERAL PIAR* Charter and the TSMC.

45.     In August 2011, FMO provided CME with a Reconciliation Statement of their accounts (the "Reconciliation Statement"), offsetting invoices issued by FMO to CME with invoices issued by CME to FMO.  FMO's statement listed all outstanding invoices issued by FMO as of December 31, 2010.  The Reconciliation Statement showed an outstanding final balance of $1,572,474.52 owed by FMO to CME   CME and FMO signed the Reconciliation Statement, which included a note of "observations" listing transactions that had been omitted from the statement.  A true and correct copy of the Reconciliation Statement, as well as a certified English translation of the Reconciliation Statement, is annexed as Exhibit 1.

46.     In spite of the parties' coming to an agreement on respective positions under the Reconciliation Statement, figures that accrued as 2011 progressed showed that FMO increasingly was in CME's debt and those figures were worsening.  The majority of the CME outstanding invoices were for amounts owed to CME by FMO under the *GENERAL PIAR* Charter and the TSMC.

47.     Following the August 2011 Reconciliation Statement, CME attempted on several occasions to reach further reconciliations of accounts with FMO.  Meetings with FMO were held

frequently, and there were volumes of communication between the parties regarding the reconciliation of accounts, but no further agreements were ever made even though FMO frequently acknowledged that it owed to CME substantial amounts.

**FMO's Liability to CME**

48.     As discussed above, CME provided goods and services to FMO under the Contracts, including but not limited to the Charters, the TSMC, and the Wagons Contract. To use the Wagons Contract as a simple example, CME provided to FMO a number of hopper-type railway wagons to improve FMO's rail transportation capabilities related to its mining operations.   When the railway wagons were delivered, CME invoiced FMO a total of $35,000,000.

49.     FMO should have supplied CME (but did not) with several shiploads of iron ore, which would have been valued at the parties' agreed pricing, so as to provide a corresponding credit on FMO's side of the ledger to offset CME's invoices for the wagons.  This did not occur; not only are the railway wagon invoices largely unpaid but so are many, many more invoices from CME.

50.     Similar scenarios have played out under the TSMC and the Charters.  CME paid to the vessel owners of the *GENERAL PIAR* (and other vessels) daily hire rates for its chartered shuttle vessels in the cumulative amount of tens of millions of dollars; FMO did not pay CME. FMO agreed to pay CME a minimum processing rate under the  TSMC; FMO did not pay CME despite CME's operation of FMO's entire maritime transportation operation.

51.     As a result of this situation, FMO currently owes CME for services already provided by CME a *__net__* amount of approximately $145  million.  Stated another way, CME has credited FMO with approximately $268 million that CME owes to FMO (largely for iron ore

products provided to CME).  But FMO owes CME approximately $413 million for the goods and services that FMO requested that CME provide to modernize and upgrade FMO's mining and transportation infrastructure.

**FMO's Management Change and Attempts to Disavow the Contracts**

52.     After the Venezuelan military assumed management of FMO in early 2013, CME repeatedly attempted to open a dialogue with the new management regarding the amount of its outstanding claims.  FMO initially tried to retroactively rewrite the terms of its agreements with CME.  Subsequently, as explained in the introduction above, FMO took the position that all of CME's contracts violated Venezuelan law and stopped supplying iron ore to CME.  As a result, CME was forced to terminate the TSMC and *GENERAL PIAR* Charter because, without payment from FMO, CME did not have the capital to continue performing under those contracts.

53.     In August 2013, after attempts to open a dialogue with FMO had failed, CME commenced an action in Venezuela's Fifth Superior Administrative Court of the Capital Region (the "Administrative Court") to obtain a declaratory judgment from that court declaring that the Contracts were legal and enforceable.

54.     In response to CME's actions in seeking payment for CME's outstanding invoices, and in an attempt to discredit and intimidate CME, FMO made criminal accusations against the directors and management of CME and subsequently, FMO caused an arrest proceeding to be instituted against CME's chairman, Tyrone Serrao, claiming that he had committed criminal actions by damaging the patrimony of the Country.

55.     In December 2013, the Venezuelan Administrative Court ordered that an audit of the parties' relationship be conducted, which would include both a legal audit and a financial audit, the latter being performed in the presence of a representative of the Venezuelan Attorney

General's office.  That audit process took place over several months and resulted in both CME and FMO filing with the Venezuelan Administrative Court their position with respect to the parties' financial position under the Contracts.  While the parties were unable to reach a fully-agreed position, FMO's own submission (the "Resolution") accepted as undisputed the majority of CME's and its agent's outstanding invoices issued under the Contracts totaling an amount of $386,376,244.72.

56.    On August 5, 2015, the Venezuelan Administrative Court issued its decision, holding that (a) it had subject matter jurisdiction over CME's application; (b) the Contracts "were executed in compliance with laws," and (c) the Contracts "do not violate or were not executed in violation of the foreign exchange laws then in effect . . . and, therefore can be subject to payment by offsetting iron ore."  The decision is not a money judgment, but rather a declaratory judgment finding that execution and performance of the Contracts did not violate Venezuelan law.

57.    CME now brings this proceeding to secure its claims against FMO to be brought in arbitration in New York, Miami, London and Zurich.

## COUNT I
## BREACH OF THE TRANSFER SYSTEM MANAGEMENT CONTRACT

58.    Plaintiff CME repeats and realleges each and every allegation set forth in paragraph 1-57 hereof with the same force and effect as if fully set forth herein.

59.    Defendant FMO entered into the TSMC with CME for the maintenance, management, and operation of FMO's Transfer System, for the purpose of transporting iron ore to ocean going export vessels.

60.     CME at all times performed its obligations under the TSMC.  CME is not in default or breach of the TSMC.

61.     FMO has failed to pay CME the agreed amounts owed to CME under the TSMC, despite having received and accepted the majority of CME's and its agent's outstanding invoices issued pursuant to the TSMC.

62.     FMO then took the position that the TSMC violated Venezuelan law.

63.     Furthermore, FMO's breach of the TSMC has deprived CME from receiving further amounts that it was entitled to under the remainder of the TSMC, and which CME would have received had FMO performed its obligations under the TSMC.

64.     As best as presently can be estimated, CME has been damaged in the principal amount of $212,262,096.46 as a result of FMO's breach of the TSMC.  Specifically, FMO owes CME $104,659,932.33 for outstanding invoices issued pursuant to the TSMC, of which amount FMO has accepted as undisputed $103,246,033.92 in its Resolution.  Furthermore, FMO is liable to CME in the further amount of $107,602,164.13 in lost revenues CME would have received under the TSMC from FMO had FMO performed for the full term of the TSMC.

## COUNT II

### BREACH OF THE *GENERAL PIAR* CHARTER

65.     Plaintiff CME repeats and realleges each and every allegation set forth in paragraphs 1-57 hereof with the same force and effect as if fully set forth herein.

66.     Defendant FMO entered into the *GENERAL PIAR* Charter with CME for the purpose of chartering a shuttle vessel to transport iron ore as part of FMO's Transfer System.

67.     As the disponent owner of the *M/V GENERAL PIAR*, CME at all times performed its obligations under the *GENERAL PIAR* Charter.   CME is not in default or in breach of the *GENERAL PIAR* Charter.

68.     FMO has failed to pay CME the agreed amounts owed to CME under the *GENERAL PIAR* Charter, despite having received and accepted the majority of CME's and its agents' outstanding invoices issued pursuant to the *GENERAL PIAR* Charter.

69.     FMO then took the position that the *GENERAL PIAR* Charter violated Venezuelan law.

70.     Furthermore, FMO's breach of the *GENERAL PIAR* Charter deprived CME from receiving further amounts that it was entitled to under the remainder of the *GENERAL PIAR* Charter, and which CME would have received had FMO performed its obligations under the *GENERAL PIAR* Charter.

71.     As best as presently can be estimated, CME has been damaged in the principal amount of $21,424,040.47 as a result of FMO's breach of the *GENERAL PIAR* Charter. Specifically, FMO owes CME $4,936,040.47 for outstanding invoices issued pursuant to the *GENERAL PIAR* Charter, of which amount FMO has accepted as undisputed $4,057,011.82 in its Resolution.  Furthermore, FMO is liable to CME in the amount of $16,488,000.00 for the additional hire payments CME would have received from FMO had FMO fully performed the *GENERAL PIAR* Charter.

## COUNT III

## BREACH OF THE WAGONS CONTRACT

72.     Plaintiff CME repeats and realleges each and every allegation set forth in paragraphs 1-57 hereof with the same force and effect as if fully set forth herein.

73.     Defendant FMO entered into the Wagons Contract with CME for the provision of railway wagons to transport iron ore and improve the capacity and efficiency of FMO's operations.

74.     CME at all times performed its obligations under the Wagons Contract and delivered to FMO the specified railway wagons as agreed between the parties.  CME is not in default or in breach of the Wagons Contract.

75.     FMO has failed to pay CME the agreed amounts owed to CME under the Wagons Contract, despite having received the railway wagons and despite having accepted CME's outstanding invoices issued pursuant to the Wagons Contract in its Resolution.

76.     As best as presently can be estimated, CME has been damaged in the principal amount of $30,153,490.36 as a result of FMO's breach of the Wagons Contract, all of which amount FMO has accepted as undisputed in its Resolution.

**COUNT IV**

**BREACH OF THE ENGLISH CHARTERS**

77.     Plaintiff CME repeats and realleges each and every allegation set forth in paragraphs 1-57 hereof with the same force and effect as if fully set forth herein.

78.     Defendant FMO entered into the English Charters with CME for the purpose of chartering shuttle vessels to transport iron ore as part of FMO's Transfer System.

79.     As the disponent owner of the chartered vessels, CME at all times performed its obligations under the English Charters.   CME is not in default or in breach of the English Charters.

80.     FMO has failed to pay CME the agreed amounts owed to CME under the English Charters, despite having received and accepted the majority of CME's and its agents outstanding invoices issued pursuant to the English Charters in its Resolution.

81.     As best as presently can be estimated, CME has been damaged in the principal amount of $4,982,498.41 as a result of FMO's breaches of the English Charters, of which amount FMO has accepted as undisputed $4,679,895.91 in its Resolution.

## CALCULATION OF CME'S DAMAGES

82.     As explained above, CME invoiced FMO for amounts due to CME under the Contracts (including the TSMC, *GENERAL PIAR* Charter, the Wagons Contract, and the English Charters).  FMO invoiced CME for the iron ore products it provided CME.  As contemplated between the parties, FMO's invoices were to be set off against CME's invoices.  However, FMO did not provide CME with enough iron ore to set off all of CME's invoices.  Because it was contemplated that the set off would always be complete (i.e., that the collective total of FMO's invoices would equal the collective total of CME's invoices), the parties did not have an agreement as to which of CME's invoices would be set off against the invoices that CME received from FMO.  As the financial position between FMO and CME became imbalanced, CME on several occasions attempted to reconcile its accounts with FMO.  The parties were able to reconcile their accounts up to December 31, 2010, but the parties never reached an agreement as to which of CME's invoices were offset against FMO's invoices issued after that date.  Hence, all of the invoices that CME issued to FMO after December 31, 2010 remained on CME's books as outstanding.  The total amount of CME's outstanding invoices is $410,782,121.04.

83.     In its Resolution, FMO recognized, and accepted as undisputed, most of CME's outstanding invoices.  The total amount FMO accepted as owing to CME was $386,376,244.72.

84.     In preparing its claims against FMO, CME determined that it should offset its outstanding invoices on its books against FMO's invoices.  CME has recognized and accepted FMO's invoices in an amount totaling $268,598,787.27.   All of these invoices were issued for the provision of iron ore products under the 2004 and 2012 Iron Ore Contracts.   Thus, in offsetting its invoices against this amount, CME first offset all of its invoices to FMO that were issued pursuant to the 2004 and 2012 Iron Ore Sales Contracts and their various addenda and appendices, totaling an amount of $158,568,662.89.

85.     After off-setting the invoices that CME issued to FMO under the 2004 and 2012 Iron Ore Sales Contracts, there remained left to be off-set invoices from FMO to CME in the amount of $110,030,124.38 against CME's remaining outstanding invoices.  CME then off set the remaining FMO invoices against CME's oldest outstanding invoices first.  CME now is claiming the amount of its outstanding invoices under the TSMC, the *GENERAL PIAR* Charter, the Wagons Contract, and the English Charters remaining after setting off all of FMO's invoices. Most of these invoices have been accepted and agreed to by FMO in its Resolution.

86.     To better illustrate CME's claim for damages, attached hereto as Exhibit 2 is a chart showing for each the TSMC, the *GENERAL PIAR* Charter, the Wagons Contract, and the English Charters: (1) the total amount invoiced by CME to FMO under the respective contracts, (2) the total amount of CME's invoices set off against FMO's invoices under the respective contracts, (3) the total amount of CME's invoices that remain outstanding after offsetting FMO's invoices, and (4) the total amount of the outstanding invoices that have been accepted by FMO in its Resolution  In addition to the amount of its outstanding invoices, after set offs, CME is also claiming for lost revenues resulting from FMO's failure to perform under the TSMC and the *GENERAL PIAR* Charter.  These amounts are also reflected in Exhibit 2.

## REQUEST FOR ORDER OF MARITIME ATTACHMENT

87.   Clause 13 of the *GENERAL PIAR* Charter states that any dispute between the parties shall be referred to arbitration in New York in accordance with Title 9, United States Code, that such dispute shall be governed by and construed in accordance with the maritime law of the United States, and that such arbitration shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc., which Plaintiff CME intends to initiate in due course.

88.   Clause 41 of the TSMC states that any dispute between the parties shall be referred to arbitration in Miami, that such dispute shall be governed by and construed in accordance with the general maritime law of the United States, and that such arbitration shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc., which Plaintiff CME intends to initiate in due course.

89.   The English Charters all provide for arbitration in London under English law, which arbitrations Plaintiff CME intends to initiate in due course.

90.   Under the Rules of the Society of Maritime Arbitrators, Inc., the prevailing party in the arbitration is entitled to an award of its attorneys' fees and expenses.  Under the TSMC, the prevailing party explicitly is entitled to recover its attorneys' fees and costs from the losing party.  Under English law, the prevailing party explicitly is entitled to recover its attorneys' fees and costs from the losing party.  Attorneys' fees and arbitration expenses from the foregoing maritime arbitrations are estimated to be US$2,000,000.

91.   It is estimated that it will take approximately two (2) years to resolve this matter.  Under relevant U.S. law/English law and arbitration procedure, a reasonable interest rate is 3.25%, resulting in the following estimated interest and attorneys' fees in addition to Plaintiff's principal claim:

| | |
|---|---|
| Pre-judgment Interest<br>(Approximately 3.25% on US $238,668,635.34 for two years) | $ 16,006,375.40 |
| Attorneys' fees and costs | $  2,000,000.00 |
| Principal Claim: | $ 238,668,635.34 |
| **Total Sought:** | **US$ 256,675,010.74** |

92.     CME's principal claim is more fully demonstrated in a chart hereto attached as Exhibit 2.

93.     FMO is not found within the Southern District of New York but does have goods, chattels, credits, bills of lading, debts, effects and monies, funds, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to it, is claimed by it, is being held for it or on its behalf, or which is being transferred for its benefit, within the jurisdiction at the following specific financial institutions:

Bank of America
100 West 33rd Street
New York, New York 10001

BNP Paribas
787 Seventh Avenue
New York, New York 10019

and it is believed that further accounts may be present at the following institutions:

The Bank of New York/Mellon

Barclays Bank

Citibank, N.A.

Deutsche Bank Trust Company Americas

HSBC Bank USA, N.A.

JPMorgan Chase Bank, N.A.

Royal Bank of Scotland

Society Generale

Standard Chartered Bank

UBS AG

Wells Fargo Bank, N.A.

94.     While all disputes arising out of the *GENERAL PIAR* Charter, TSMC, and English Charters may be arbitrated in New York, Miami, and London, respectively, this action is submitted in accordance with Rule B of the Supplemental Rules of Admiralty and Maritime Claims of the Federal Rules of Civil Procedure as well as 9 U.S.C. § 8 and should not be considered a waiver of the arbitration clauses in the aforementioned Contracts.

## APPLICATION FOR ORDER OF ATTACHMENT AND TEMPORARY RESTRAINING ORDER IN AID OF FOREIGN ARBITRATION PURSUANT TO N.Y. CPLR § 7502

95.     Plaintiff CME also seeks relief from this Court pursuant to Federal Rule 64 and 65 and N.Y. C.P.L.R. §§ 7502(c) and 6212(a) so that any award to which CME may be entitled in the pending Zurich arbitration for the Wagons Contract (as well as any claims under the other contracts for which Rule B is deemed not appropriate) will not be rendered ineffectual.

96.     Specifically Plaintiff prays for:

   a.   an attachment to be issued in support of the Wagons Contract arbitration to be commenced in Zurich over property in which Defendant FMO has an interest up to the sum of **$30,153,490.36** located within the Southern District of New York, including but not limited to property held for or debts owed to FMO, and

   b.   a temporary restraining order pursuant to CPLR § 6210 prohibiting Defendant FMO or garnishees of FMO's assets – including but not limited to Bank of

America and BNP Paribas – from disposing of, selling, transferring, encumbering, removing, paying over, conveying or otherwise interfering with the property interests of FMO until the application for attachment can be heard.

97.    As a result of Defendant FMO's breach, CME now estimates that it has been damaged in the following amounts under the Wagons Contract:

| | |
|---|---|
| Pre-judgment Interest (Approximately 3.25% on US $30,153,490.36 for two years) | $  2,022,251.84 |
| Attorneys' fees and costs | $    500,000.00 |
| Principal Claim: | $ 30,153,490.36 |
| **Total Sought:** | **US$ 32,675,742.20** |

98.    As set forth more fully in the Memorandum of Law filed in support of this Verified Complaint and CME's attachment applications, FMO's property is subject to attachment in this District pursuant to N.Y. C.P.L.R. § 7502(c).

99.    Also set forth in the Memorandum, CME has met its burden of showing that it likely will succeed on the merits in the Wagons Contract arbitration, in light of the fact that CME has performed the entirety of its contractual obligations, FMO has failed to pay, and FMO has accepted CME's claims under that contract.

100.    Furthermore, as CME has credited FMO's counterclaims by offsetting CME's total claims by FMO's counterclaims, "the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." N.Y. C.P.L.R. § 6212(a).

101.    No prior application for this relief has been made.  Plaintiff is proceeding on notice with a request for a temporary restraining order under CPLR § 6210 because of exigent circumstances and the real risk that Defendant FMO upon learning of this action immediately

will seek to transfer assets out of this District in an effort to thwart or otherwise entirely avoid paying CME the sums due and owing.

**WHEREFORE**, Plaintiff Commodities & Minerals Enterprise Ltd. demands judgment as follows:

1.     That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against the Defendant CVG Ferrominera Orinoco, C.A. in the amount of $266,675,010.74 (including estimated interest, and attorneys' fees), and if Defendant CVG Ferrominera Orinoco, C.A. cannot be found, then that its goods, chattels, credits, bills of lading, debts, effects and monies, funds, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to it, is claimed by it, is being held for it or on its behalf, or which is being transferred for its benefit. within the district may be attached in an amount sufficient to answer Plaintiff's claim;

2.     That process in due form of law according to the practice of this Court in the form of a temporary restraining order and order of attachment pursuant to N.Y. C.P.L.R. § 7502(c) be issued against the Defendant CVG Ferrominera Orinoco, C.A. in the amount of $32,675,742.20 (including estimated interest, and attorneys' fees), and if Defendant CVG Ferrominera Orinoco, C.A. cannot be found, then that its goods, chattels, bills of lading, debts, effects and monies, funds, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to it, is claimed by it, is being held for it or on its behalf, or which is being transferred for its benefit, within the district may be attached in an amount sufficient to answer Plaintiff's claim;

3.      That CVG Ferrominera Orinoco, C.A. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

4.      That this court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court, along with awarding Plaintiff's attorney's fees and costs in connection with these actions;

5.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

6.      That this Court grant Plaintiff such other and further relief which it may deem just and proper.

Dated: February 3, 2016
       New York, New York

                                    Respectfully submitted,

                          By:       _____
                                    Michael J. Frevola
                                    Marisa A. Marinelli
                                    Christopher R. Nolan
                                    F. Robert Denig
                                    HOLLAND & KNIGHT LLP
                                    31 West 52nd Street
                                    New York, NY 10019
                                    Telephone:  (212) 513-3200
                                    Facsimile:  (212) 385-9010
                                    Email: michael.frevola@hklaw.com
                                           marisa.marinelli@hklaw.com
                                           christopher.nolan@hklaw.com
                                           robert.denig@hklaw.com

                                    *Counsel for Commodities & Minerals
                                    Enterprise Ltd.*

## VERIFICATION

STATE OF NEW YORK          )
                                              :ss.:
COUNTY OF NEW YORK       )

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for Plaintiff Commodities & Minerals Enterprise Ltd. in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Plaintiff and corresponded with Plaintiff regarding this matter. I am authorized by Plaintiff to make this verification, and the reason for my making it as opposed to an officer or director of Plaintiff is that there are none within the jurisdiction of this Honorable Court.

_____
Michael J. Frevola

Sworn to before me this
3rd day of February, 2016

_____
Notary Public

GLENN M. HUZINEC
Notary Public, State of New York
No. 01HU4873127
Qualified in Richmond County
Certified in New York County
Commission Expires October 6, 20 18

#37689475_v11

30

# Exhibit 1

  

# A C T A   D E   C O M P E N S A C I O N

## CME COMMODITIES & MINERALS ENTERPRISES – CVG FERROMINERA ORINOCO, C.A

En Ciudad Guayana, a los 15 días del mes de Agosto  del 2011, a los efectos de realizar Compensación de cuentas por cobrar y pagar de ambas empresas al 31/12/2010,  por la cantidad **CIENTO NOVENTA Y OCHO MILLONES OCHOCIENTOS TREINTA Y SEIS MIL OCHOCIENTOS SETENTA Y TRES  CON 80/100 CTS  (USD 198.836.873,80),**  a favor de la empresa CME COMMODITIES & MINERALS ENTERPRISES, y **CIENTO NOVENTA Y SIETE MILLONES DOSCIENTOS SESENTA Y CUATRO MIL TRESCIENTOS NOVENTA Y NUEVE  DOLARES CON 28/100CTS ( USD 197.545.253,70)** a favor de la empresa CVG Ferrominera , quedando un balance final a favor de CME COMMODITIES ENTERPRISES  de  **UN MILLON QUINIENTOS SETENTA Y DOS MIL CUATROCIENTOS SETENTA Y CUATRO CON 52/100 CTS ( USD 1.572.474,52)** , tal como se indica a continuación:



1

  

| CONCEPTO | MONTO EN USD |
|---|---|
| Cuentas por Pagar a CVG Ferrominera Orinoco:Ventas de Mineral de Hierro y Briquetas | **197.264.399,28** |
| Cuentas por cobrar a CVG Ferrominera : Proyectos de Ingenieria | -38.174.084,32 |
| Cuentas por cobrar a CVG Ferrominera Orinoco: Demoras, Penalidades, Comisiones | -87.915.987,00 |
| Cuentas por cobrar CVG Ferrominera Orinoco : Buques de Acarreo | -36.353.214,60 |
| Cuentas por cobrar CVG Ferrominera Orinoco : Compra de Pellas Importadas | -15.992.031,75 |
| Cuentas por cobrar CVG Ferrominera Orinoco : Pagos realizados a terceros en nombre de FMO | -4.214.479,35 |
| Cuentas por cobrar CVG Ferrominera Orinoco : Cuentas de Garantia | -12.900.000,00 |
| Cuentas por cobrar CVG Ferrominera Orinoco : Gerencia de Estacion de Transferencia | -5.287.096,78 |
| Total saldo a Compensar | -198.836.873,80 |
| Balance a Favor de CME | -1.572.474,52 |

En prueba de conformidad firman:

Por:
**CME COMMODITIES & MINERALS ENTERPRISES**

Tyróne Serrao
Presidente

**C.V.G. FERROMINERA ORINOCO, C.A.**

Juan Anibal Vasquez
Gerente General de Comercialización y Ventas

2





## ACTA DE CONCILIACION PARCIAL N° 3
### Detalle Cuenta por Cobrar a CME al 31-12-2010
### FACTURACION DE MINERAL DE HIERRO Y BRIQUETAS
### SALDOS EN DOLARES (USD)

**OCEAN MERCY**

| N° de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 20000513 | 12/11/2010 | FSF-3° PARTE | FACTURA PROVISIONAL | 2.379.608,63 | | |
| CMEB-606-10 | 31/03/2010 | ESTAC TRANSFERENCIA - AGOSTO 2010 | | | -887.096,78 | |
| CMEB-609-10 | 01/09/2010 | ESTAC TRANSFERENCIA - SEPTIEMB 2010 ( usd 1.100.000) | | | -1.100.000,00 | |
| CMEB-607-10 | 05/10/2010 | ESTAC TRANSFERENCIA - OCTUBRE 2010 (USD 1.100.000) | | | -392.509,85 | |
| | | | Total | 2.379.608,63 | -2.379.608,63 | 0,00 |

**DESERT WIND P061/10 - (HBI)**

| N° de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 20000514 | 12/11/2010 | HBI | FACTURA PROVISIONAL | 8.580.000,00 | | |
| | | AJUSTE 40% FACTURADO ARIVENCA | | | -3.432.000,00 | |
| CMEB-607-10 | 05/10/2010 | ESTAC TRANSFERENCIA - OCTUBRE 2010 (USD 1.100.000) | | | -707.490,15 | |
| CMEB-608-10 | 03/11/2010 | ESTAC TRANSFERENCIA - NOVIEMBRE 2010 | | | -1.100.000,00 | |
| CMEB-608-10 | 13/12/2010 | ESTAC TRANSFERENCIA - DICIEMBRE 2010 | | | -1.100.000,00 | |
| CMEB-299-10 | 11/09/2010 | TRANSFER HOPPER FOR BOCA GRANDE II | | | -302.955,54 | |
| CMEB-258-09 | | DOCK REINFORCEMET | | | -162.265,95 | |
| CMEB-259-09 | | DOCK REINFORCEMET - CARGA BARCO | | | -822.984,74 | |
| CMEB-199-09 | | BLOUNT-1ST HRE | | | -1.067.027,54 | |
| DNB-349-09 | | DEMORA | | | -85.455,96 | |
| | | | Total | 8.580.000,00 | -8.580.000,00 | 0,00 |

**Hong Express Z038/10 (FF1)**

| N° de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 20000526 | 16/11/2010 | FF1 | FACTURA PROVISIONAL | 2.569.595,23 | | |
| CMEB-200-09 | | BLOUNT-2ND HRE (PORCION EN DOLARES) | | | -494.455,52 | |
| DNB-349-09 | | DEMORA | | | -2.075.139,71 | |
| | | | Total | 2.569.595,23 | -2.569.595,23 | 0,00 |

**RIO GOLD P062/10 - (HBI)**

| N° de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 20000537 | 30/11/2010 | HBI | FACTURA UNICA | 2.703.265,00 | | |
| DNB-349-09 | | DEMORA | | | -1.091.306,00 | |
| DNB-051-09 | | DEMORA | | | -483.636,06 | |
| DNB-402-09 | | DEMORA | | | -26.925,00 | |
| DNB-423-09 | | DEMORA | | | -369.258,99 | |
| CMECH-2905 | | MATERIALES FERROVIARIOS | | | -156.769,14 | |
| INCOMB-436-09 | | PAGO DE COMISION A CME POR COOR DE VTAS DE MINERAL | | | -188.100,58 | |
| INCOMB-456-09 | | PAGO DE COMISION A CME POR COOR DE VTAS DE MINERAL | | | -37.869,78 | |
| INCOMB-457-09 | | PAGO DE COMISION A CME POR COOR DE VTAS DE MINERAL | | | -61.518,90 | |
| INCOMB-466-09 | | PAGO DE COMISION A CME POR COOR DE VTAS DE MINERAL | | | -23.681,37 | |
| INCOMB-470-09 | | PAGO DE COMISION A CME POR COOR DE VTAS DE MINERAL | | | -22.832,06 | |
| INCOMB-478-09 | | PAGO DE COMISION A CME POR COOR DE VTAS DE MINERAL | | | -13.585,34 | |
| INCOMB-482-09 | | PAGO DE COMISION A CME POR COOR DE VTAS DE MINERAL | | | -45.175,87 | |
| DNB-409-09 | | PENALIDAD POR VENTA DE MINERAL | | | -39.687,85 | |
| DNB-409-09 | | PENALIDAD POR VENTA DE MINERAL | | | -32.261,60 | |
| DNB-419-09 | | PENALIDAD POR VENTA DE MINERAL | | | -14.885,19 | |
| DNB-425-09 | | PENALIDAD POR VENTA DE MINERAL | | | -168,27 | |
| DNB-320-09 | | PENALIDAD POR VENTA DE MINERAL | | | -1.553,10 | |
| CMEB-257-09 | | CARGA BARCO (Diferencia entre lo conciliado y factura) | | | -57.894,76 | |
| CMEB-260-09 | | DOCK REINFORCEMET - CARGA BARCO | | | -56.995,95 | |
| | | | Total | 2.703.265,00 | -2.703.265,00 | 0,00 |

**RIO GOLD P062/10 - (HBI)**

| N° de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 20000538 | 30/11/2010 | HBI | FACTURA UNICA | 6.738.190,00 | | |
| CMEB-260-09 | | DOCK REINFORCEMET - CARGA BARCO | | | -565.899,79 | |
| | | BOND-RE TRANSFER SYSTEM MANAGEMENT CONTRACT-REFURBISHMENT PROGRAMME | | | -2.876.914,21 | |
| | | | Total | 6.738.190,00 | -6.738.190,00 | 0,00 |

**Hebei Pride E043/10 (FSF)**

| N° de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 20000544 | 30/11/2010 | FSF | FACTURA PROVISIONAL | 2.887.611,92 | | |
| | | BOND-RE TRANSFER SYSTEM MANAGEMENT CONTRACT-REFURBISHMENT PROGRAMME | | | -524.185,79 | |
| | | PERFORMANCE BOND - RE TRANSFER SYSTEM | | | -2.363.426,13 | |
| | | | Total | 2.887.611,92 | -2.887.611,92 | 0,00 |

**PB Eagle Z093/10 (FF-1)**

| N° de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 20000545 | 30/11/2010 | FF1 | FACTURA PROVISIONAL | 2.413.166,72 | | |
| | | PERFORMANCE BOND - RE TRANSFER SYSTEM MANAGEMENT CONTRACT | | | -1.136.573,87 | |
| | | PAYMENT OF PERFORMANCE BOND - GENERAL PIAR | | | -1.276.592,85 | |
| | | | Total | 2.413.166,72 | -2.413.166,72 | 0,00 |

**HONG OCEAN Z097/10**

| N° de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 20000552 | 13/12/2010 | | FACTURA PROVISIONAL | 2.420.969,47 | | |
| CMEB-122-09 | | FLETE MUERTO MN CALM SEAS | | | -121.311,10 | |
| CMEB-305-09 | | PENALIDADES MN VENTURER | | | -10.613,04 | |
| | | PAYMENT OF PERFORMANCE BOND - GENERAL PIAR | | | -1.723.407,15 | |
| | | PAGO EN CUENTA RADIO HOLLAND | | | -41.398,50 | |

| | | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| | | PAGO EN CUENTA P&I | | | -188.560,83 | |
| | | PAGO EN CUENTA LONDON SPECIAL RISKS | | | -190.078,49 | |
| | | PAYMENT OF PERFORMANCE BOND -GYPSUM INTEGRITY | | | -165.425,36 | |
| | | | Total | 2.420.992,47 | -2.420.992,47 | 0,00 |

**Golden San Z052/10 (FSF)**

| Nº de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 20000555 | 13/12/2010 | FSF | FACTURA PROVISIONAL | 2.546.425,28 | | |
| | | PAYMENT OF PERFORMANCE BOND -GYPSUM INTEGRITY | | | -2.546.425,28 | |
| | | | Total | 2.546.425,28 | -2.546.425,28 | 0,00 |

**M/N IRICA B021/10**

| Nº de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 20000556 | 12/12/2010 | | FACTURA PROVISIONAL | 1.318.556,41 | | |
| | | Nota de debito fact CMEB-191-09 | | | 72.581,92 | |
| DMB-427-09 | | Seguro según Cláusula 29 del Contrato | | | -135.400,00 | |
| | | Nota de debito fact CMEB-200-09 | | | -80.544,48 | |
| CMEB-369-09 | | | | | -555.000,00 | |
| CMEB-391-09 | | | | | -555.000,00 | |
| CMEB-392-09 | | | | | -63.173,85 | |
| | | | Total | 1.318.556,41 | -1.318.556,41 | 0,00 |

**NO M/N GULF ADMADI**

| Nº de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 700001817 | 31/12/2010 | DESPACHO EN LA CARGA | | 3.979,86 | | |
| CMEB-392-09 | | | | | -3.979,86 | |
| | | | Total | 3.979,86 | -3.979,86 | 0,00 |

**NO M/N NATS EMPEROR P022/**

| Nº de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 700001818 | 31/12/2010 | DESPACHO EN LA CARGA | | 8.038,19 | | |
| CMEB-392-09 | | | | | -8.038,19 | |
| | | | Total | 8.038,19 | -8.038,19 | 0,00 |

**NO M/N YONG YIA MEN P046**

| Nº de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 700001819 | 31/12/2010 | DESPACHO EN LA CARGA | | 4.212,50 | | |
| CMEB-392-09 | | | | | -4.212,50 | |
| | | | Total | 4.212,50 | -4.212,50 | 0,00 |

**NO M/N NASSAU PRIDE P060**

| Nº de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 700001820 | 31/12/2010 | DESPACHO EN LA CARGA | | 2.126,25 | | |
| CMEB-392-09 | | | | | -2.126,25 | |
| | | | Total | 2.126,25 | -2.126,25 | 0,00 |

**NO M/N IRING P052**

| Nº de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 700001822 | 31/12/2010 | DESPACHO EN LA CARGA | | 8.059,80 | | |
| CMEB-392-09 | | | | | -8.059,80 | |
| | | | Total | 8.059,80 | -8.059,80 | 0,00 |

**NO M/N TITAN**

| Nº de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 700001823 | 31/12/2010 | DESPACHO EN LA CARGA | | 1.841,87 | | |
| CMEB-392-09 | | | | | -1.841,87 | |
| | | | Total | 1.841,87 | -1.841,87 | 0,00 |

**NO M/N SENECA MAIDEN**

| Nº de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| 700001824 | 31/12/2010 | DESPACHO EN LA CARGA | | 6.500,00 | | |
| CMEB-393-09 | | | | | -6.500,00 | |
| | | | Total | 6.500,00 | -6.500,00 | 0,00 |

| Nº de Factura | Fecha | Tipo | Descripcion | Debito | Credito | SALDO |
|---|---|---|---|---|---|---|
| CMEB-392-09 | | Remanente de factura | | | -437.057,88 | |
| CMEB-393-09 | | | | | -556.000,00 | |
| | | Nota de debito fact CMEB-142-09 | | | 61.455,67 | |
| | | Nota de debito fact CMEB-140-09 | | | 86.259,64 | |
| | | Nota de debito fact CMEB-138-09 | | | 31.443,16 | |
| | | Nota de debito fact CMEB-179-09 | | | 70.359,72 | |
| | | Ajuste factura 2000820 por corresponder al año 2011 | | -87.418,20 | 136.943,90 | |
| | | Ajuste factura 2000500 por corresponder al año 2011 | | -49.525,70 | | |
| CMEB-128-09 | | (Ajuste factura no aplica ITAGLAD -2ST HIRE | | | -270,00 | |
| | | ajuste cuota marzo 210-adquisicion 214 vagones | | | -1.300,00 | |
| | | PAYMENT OF PERFORMANCE BOND -GYPSUM INTEGRITY | | | -288.149,38 | |
| | | 5% FINAL INSTALLMENT STAKER CONTRACT | | | -539.215,00 | |
| | | | Total | -136.943,90 | -1.435.629,83 | -1.572.473,55 |

| | | |
|---|---|---|
| **TOTAL COMPENSACION PARCIAL Nº 3 AL 31-12-2010** | 28.643.442,03 | (28.215.915,58) | -1.572.473,55 |



**Observaciones:**

1. Queda un monto por USD 280.854,42 a favor de FMO, el cual se origina por descuentos aplicados por CME sin soportes directamente del pago de mineral, los cuales se describen a continuación:

Usd   70.230,60   CMEB-262-07-Descontado de la factura 900001082 MN PEARL C Z022/08
Usd  103.339,44   CMEB-271-07-Descontado de la factura 900001082 MN PEARL C Z022/08
Usd   50.569,02   SIN IDENTIFICAR- Descontado de la factura 90000183 MN NAVIOS TITAN Z004/06
Usd   59.053,69   SIN IDENTIFICAR- Descontado de la factura 90000179 MN CENTURY STAR Z001/06
Usd   -2.338,42   Saldo Compensación a favor de CME  del proyecto "Vagones"

Esperamos soportes de CME donde se demuestre que los descuento aplicados por ellos son correctos. *Los soportes fueron enviados por correo hoy 15 de Agosto 2011 a FMO, los cuales se encuentran en revisión por parte del FMO.*

2. Queda un monto de USD 138.377,32 en reclamo por parte de CME, donde manifiesta haber realizado dos pagos dobles, esto encuentra en revisión a fin de reconocer o no, el mencionado reclamo.

3. Quedan pendiente por revisión, la siguientes facturas por pagar a CME:

DNB-242-09 USD 161.045,24 ORT del buque Merilla
DNB-352-09 USD 54.785,24 Penalidad del buque Qiang Sheng

*4. Queda pendiente un monto de 5,000,000.00 USD a favor de CME de un pago realizado en Diciembre 2009 al proveedor OXBOW de Alcasa en nombre de FMO; el cual se compensará con la venta del Mineral de Hierro.*

  

# REIMBURSEMENT AGREEMENT

## CME COMMODITIES & MINERALS ENTERPRISES – CVG FERROMINERA ORINOCO, C.A

Hereby issued in Guayana City on this 15th day of August, 2011, for the settling of accounts receivable and payable for both companies through 12/31/2010, in the amounts of **ONE HUNDRED NINETY-EIGHT MILLION, EIGHT HUNDRED THIRTY-SIX THOUSAND, EIGHT HUNDRED SEVENTY-THREE DOLLARS AND 80/100 CENTS (USD 198,836,873.80)** payable to the CME COMMODITIES & MINERALS ENTERPRISES company, and **ONE HUNDRED NINETY-SEVEN MILLION, TWO HUNDRED SIXTY-FOUR THOUSAND, THREE HUNDRED NINETY-NINE DOLLARS AND 70/100 CENTS (USD 197,545,253.70)** payable to the CVG Ferrominera company, leaving CME COMMODITIES ENTERPRISES with a final credit balance of **ONE MILLION FIVE HUNDRED SEVENTY-TWO THOUSAND, FOUR HUNDRED SEVENTY-FOUR DOLLARS AND 52/100 CENTS (USD 1,572,474.52)**, as indicated below:

[*Signature*]

1





| ITEM | AMOUNT IN USD |
|---|---|
| Accounts Payable to CVG Ferrominera Orinoco: Sales of Iron Ore and Briquettes | **197,264,399.28** |
| Accounts Receivable from CVG Ferrominera: Engineering Projects | -36,174,064.32 |
| Accounts Receivable from CVG Ferrominera Orinoco: Delays, Penalties, Commissions | -87,915,987.00 |
| Accounts Receivable from CVG Ferrominera Orinoco: Freight Transport | -36,353,214.60 |
| Accounts Receivable from CVG Ferrominera Orinoco: Purchase of Imported Pellets | -15,992,031.75 |
| Accounts Receivable from CVG Ferrominera Orinoco: Payments issued to third parties on behalf of FMO | -4,214,479.35 |
| Accounts Receivable from CVG Ferrominera Orinoco: Escrow Accounts | -12,900,000.00 |
| Accounts Receivable from CVG Ferrominera Orinoco: Transfer Station Control | -5,287,096.78 |
| **Total Outstanding Balance** | **-198,836,873.80** |
|  |  |
| **CME's Credit Balance** | **-1,572,474.52** |

Signed in witness thereof:

**By:**
**CME COMMODITIES & MINERALS ENTERPRISES**     **C.V.G. FERROMINERA ORINOCO, C.A.**

[*Signature*]                                                    [*Signature*]

Tyrone Serrao                                                Juan Aníbal Vasquez
President                                                       Managing Director of Marketing and Sales

2





## PARTIAL PAYMENT AGREEMENT No. 3

### Itemized Accounts Receivable from CME through 12-31-2010

### INVOICE FOR IRON ORE AND BRIQUETTES
### BALANCES IN DOLLARS (USD)

**OCEAN MERCY**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 20000513 | 11/12/2010 | FSF-2ND PART | PROVISIONAL INVOICE | 2,379,606.63 | | |
| CMEB-605-10 | 03/31/2010 | STATION TRANSFER - AUGUST 2010 | | | -887,096.78 | |
| CMEB-606-10 | 09/01/2010 | STATION TRANSFER - SEPTEMBER 2010 (USD 1,100,000) | | | -1,100,000.00 | |
| CMEB-607-10 | 10/05/2010 | STATION TRANSFER - OCTOBER 2010 (USD 1,100,000) | | | -392,509.85 | |
| | | | Total | 2,379,606.63 | -2,379,606.63 | 0.00 |

**DESERT WIND POS1/10 - (HBI)**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 20000514 | 11/12/2010 | HBI | PROVISIONAL INVOICE | 8,580,000.00 | | |
| | | ADJUSTMENT 40% BILLED ARIVENCA | | | -3,432,000.00 | |
| CMEB-607-10 | 10/05/2010 | STATION TRANSFER - OCTOBER 2010 (USD 1,100,000) | | | -707,480.15 | |
| CMEB-608-10 | 11/03/2010 | STATION TRANSFER - NOVEMBER 2010 | | | -1,000,000.00 | |
| CMEB-609-10 | 12/13/2010 | STATION TRANSFER - DECEMBER 2010 | | | -1,000,000.00 | |
| CMEB-299-10 | 09/11/2010 | TRANSFER HOPPER FOR BOCA GRANDE II | | | -302,855.54 | |
| CMEB-258-09 | | DOCK REINFORCEMENT | | | -162,265.95 | |
| CMEB-259-09 | | DOCK REINFORCEMENT - VESSEL LOAD | | | -622,894.74 | |
| CMEB-199-09 | | BLOUNT-1ST HIRE | | | -1,067,027.64 | |
| DNB-349-09 | | DELAY | | | -85,465.98 | |
| | | | Total | 8,580,000.00 | -8,580,000.00 | 0.00 |

**Hong Express Z099/10 (FF1)**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 20000528 | 11/18/2010 | FF1 | PROVISIONAL INVOICE | 2,569,595.23 | | |
| CMEB-200-09 | | BLOUNT-2ND HIRE (PORTION IN DOLLARS) | | | -494,455.52 | |
| DNB-349-09 | | DELAY | | | -2,075,139.71 | |
| | | | Total | 2,569,595.23 | -2,569,595.23 | 0.00 |

**RIO GOLD POS2/10 - (HBI)**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 20000537 | 11/30/2010 | HBI | SOLE INVOICE | 2,703,265.00 | -1,081,306.00 | |
| DNB-349-09 | | DELAY | | | -463,835.05 | |
| DNB-081-09 | | DELAY | | | -26,925.00 | |
| DNB-402-09 | | DELAY | | | -369,258.99 | |
| DNB-403-09 | | DELAY | | | -155,769.14 | |
| CMECH-2906 | | RAILWAY TRANSPORT MATERIALS | | | -188,196.58 | |
| INCOMB-436-09 | | COMMISSION PAYMENT TO CME FOR ORGANIZING ORE SALES | | | -37,889.78 | |
| INCOMB-458-09 | | COMMISSION PAYMENT TO CME FOR ORGANIZING ORE SALES | | | -51,518.30 | |
| INCOMB-467-09 | | COMMISSION PAYMENT TO CME FOR ORGANIZING ORE SALES | | | -23,561.37 | |
| INCOMB-468-09 | | COMMISSION PAYMENT TO CME FOR ORGANIZING ORE SALES | | | -22,831.06 | |
| INCOMB-470-09 | | COMMISSION PAYMENT TO CME FOR ORGANIZING ORE SALES | | | -13,585.34 | |
| INCOMB-476-09 | | COMMISSION PAYMENT TO CME FOR ORGANIZING ORE SALES | | | -45,175.67 | |
| INCOMB-482-09 | | COMMISSION PAYMENT TO CME FOR ORGANIZING ORE SALES | | | -39,687.85 | |
| DNB-406-09 | | PENALTY FOR ORE SALE | | | -32,251.60 | |
| DNB-408-09 | | PENALTY FOR ORE SALE | | | -14,885.19 | |
| DNB-419-09 | | PENALTY FOR ORE SALE | | | -165.27 | |
| DNB-426-09 | | PENALTY FOR ORE SALE | | | -1,553.10 | |
| CMEB-257-09 | | VESSEL LOAD (Difference between settled and billed amounts) | | | -57,894.78 | |
| CMEB-260-09 | | DOCK REINFORCEMENT - VESSEL LOAD | | | -56,995.95 | |
| | | | Total | 2,703,265.00 | -2,703,265.00 | 0.00 |

**RIO GOLD POS2/10 - (HBI)**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 20000538 | 11/30/2010 | HBI | SOLE INVOICE | 5,736,190.00 | -2,294,476.00 | |
| CMEB-260-09 | | DOCK REINFORCEMENT - VESSEL LOAD | | | -565,899.79 | |
| | | BOND-RE TRANSFER SYSTEM MANAGEMENT CONTRACT-REFURBISHMENT PROGRAMME | | | -2,875,814.21 | |
| | | | Total | 5,736,190.00 | -5,736,190.00 | 0.00 |

**Hebel Pride B043/10 (FSF)**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 20000544 | 11/30/2010 | FSF | PROVISIONAL INVOICE | 2,887,611.92 | | |
| | | BOND RE-TRANSFER SYSTEM MANAGEMENT CONTRACT-REFURBISHMENT PROGRAMME | | | -624,185.79 | |
| | | PERFORMANCE BOND - RE TRANSFER SYSTEM | | | -2,363,426.13 | |
| | | | Total | 2,887,611.92 | -2,887,611.92 | 0.00 |

**PB Eagle Z093/10 (FF-1)**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 20000545 | 11/30/2010 | FF1 | PROVISIONAL INVOICE | 2,413,168.72 | | |
| | | PERFORMANCE BOND - RE TRANSFER SYSTEM MANAGEMENT CONTRACT | | | -1,136,573.87 | |
| | | PAYMENT OF PERFORMANCE BOND - GENERAL PIAR | | | -1,276,592.85 | |
| | | | Total | 2,413,168.72 | -2,413,168.72 | 0.00 |

3




**HONG OCEAN Z057/10**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 20000552 | 12/13/2010 | | PROVISIONAL INVOICE | 2,420,992.47 | | |
| CMEB-122-09 | | DEAD FREIGHT MN CALM SEAS | | | -121,311.10 | |
| CMEB-305-09 | | MN VENTURER PENALTIES | | | -10,813.04 | |
| | | PAYMENT OF PERFORMANCE BOND - GENERAL PIAR | | | -1,723,407.15 | |
| | | RADIO HOLLAND ACCOUNT PAYMENT | | | -41,398.50 | |
| | | P&I ACCOUNT PAYMENT | | | -168,560.83 | |
| | | LONDON SPECIAL RISKS ACCOUNT PAYMENT | | | -190,076.49 | |
| | | PAYMENT OF PERFORMANCE BOND - GENERAL PIAR | | | -165,425.36 | |
| | | | Total | 2,420,992.47 | -2,420,992.47 | 0.00 |

**Golden Sun Z052/10 (FSF)**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 20000555 | 12/13/2010 | FSF | PROVISIONAL INVOICE | 2,546,425.28 | | |
| | | PAYMENT OF PERFORMANCE BOND - GYPSUM INTEGRITY | | | -2,546,425.28 | |
| | | | Total | 2,546,425.28 | -2,546,425.28 | 0.00 |

**M/N IRIDA 8031/10**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 20000558 | 12/12/2010 | | PROVISIONAL INVOICE | 1,316,556.41 | | |
| | | Debit note invoice CMEB-191-09 | | | 72,561.92 | |
| DNB-427-09 | | Insurance as per Contract Clause 29 | | | -135,400.00 | |
| | | Debit note invoice CMEB-200-09 | | | -60,544.48 | |
| CMEB-390-09 | | | | | -555,000.00 | |
| CMEB-391-09 | | | | | -555,000.00 | |
| CMEB-392-09 | | | | | -83,173.85 | |
| | | | Total | 1,316,556.41 | -1,316,556.41 | 0.00 |

**ND M/N GULF ADMADI**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 700001617 | 12/31/2010 | FREIGHT SHIPPING | PROVISIONAL INVOICE | 3,979.86 | | |
| CMEB-392-09 | | | | | -3,979.86 | |
| | | | Total | 3,979.86 | -3,979.86 | 0.00 |

**ND M/N NATS EMPREROR P022/**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 700001618 | 12/31/2010 | FREIGHT SHIPPING | PROVISIONAL INVOICE | 8,038.19 | | |
| CMEB-392-09 | | | | | -8,038.19 | |
| | | | Total | 8,038.19 | -8,038.19 | 0.00 |

**ND M/N YONG YIA MEN P046**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 700001619 | 12/31/2010 | FREIGHT SHIPPING | PROVISIONAL INVOICE | 4,212.50 | | |
| CMEB-392-09 | | | | | -4,212.50 | |
| | | | Total | 4,212.50 | -4,212.50 | 0.00 |

**ND M/N NASSAU PRIDE P050**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 700001620 | 12/31/2010 | FREIGHT SHIPPING | PROVISIONAL INVOICE | 2,126.25 | | |
| CMEB-392-09 | | | | | -2,126.25 | |
| | | | Total | 2,126.25 | -2,126.25 | 0.00 |

**ND M/N IRINI P052**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 700001622 | 12/31/2010 | FREIGHT SHIPPING | PROVISIONAL INVOICE | 8,059.80 | | |
| CMEB-392-09 | | | | | -8,059.80 | |
| | | | Total | 8,059.80 | -8,059.80 | 0.00 |

**ND M/N TITAN**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 700001623 | 12/31/2010 | FREIGHT SHIPPING | PROVISIONAL INVOICE | 1,841.67 | | |
| CMEB-392-09 | | | | | -1,841.67 | |
| | | | Total | 1,841.67 | -1,841.67 | 0.00 |

**ND M/N SENECA MAIDEN**

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| 700001623 | 12/31/2010 | FREIGHT SHIPPING | PROVISIONAL INVOICE | 6,500.00 | | |
| CMEB-392-09 | | | | | -6,500.00 | |
| | | | Total | 6,500.00 | -6,500.00 | 0.00 |

| Billing No. | Date | Type | Description | Debit | Credit | BALANCE |
|---|---|---|---|---|---|---|
| CMEB-392-09 | | Outstanding Charges | | | -437,067.88 | |
| CMEB-393-09 | | | | | -555,000.00 | |
| | | Debit note invoice CMEB-142-09 | | | 61,466.87 | |
| | | Debit note invoice CMEB-140-09 | | | 85,258.94 | |
| | | Debit note invoice CMEB-136-09 | | | 31,443.16 | |
| | | Debit note invoice CMEB-179-09 | | | 70,359.72 | |
| | | Adjustment invoice 2000620 corresponding to 2011 year | | -67,418.20 | 136,943.90 | |
| | | Adjustment invoice 2000599 corresponding to 2011 year | | -69,525.70 | | |
| CMEB-128-09 | | (Billing adjustment does not apply) TASGAD - 2ST HIRE | | | -270.00 | |
| | | adjustment for March Installment 210-purchase of 214 corriages | | | -1,300.00 | |
| | | PAYMENT OF PERFORMANCE BOND -GYPSUM INTEGRITY | | | -288,149.36 | |
| | | 5% FINAL INSTALLMENT STAKER CONTRACT | | | -539,215.00 | |
| | | | Total | -136,943.90 | -1,435,529.65 | -1,572,473.55 |

4



 

| TOTAL PARTIAL REIMBURSEMENT No. 3 THROUGH 12-31-2010 | 26,643,442.03 | (28,215,915 58) | -1,572,473.55 |
| --- | --- | --- | --- |

[*Initials*]                                                                                            [*Initials*]

5





Observations:

1. FMO has a remaining credit balance of USD 280,854.42 as a result of unsubstantiated discounts applied by CME for direct payments for minerals, as described below:

| USD | 70,230.60 | CMEB-262-07-Discounted from invoice 900001082 MN PEARL C Z022/08 |
| USD | 103,339.44 | CMEB-271-07-Discounted from invoice 900001082 MN PEARL C Z022/08 |
| USD | 50,569.02 | UNIDENTIFIED- Discounted from invoice 90000183 MN NAVIOS TITAN Z004/06 |
| USD | 59,053.69 | UNIDENTIFIED- Discounted from invoice 90000179 MN CENTURY STAR Z001/06 |
| USD | -2,338.42 | Balance Payable to CME for the "Vagones" Project |

We are awaiting supporting documentation from CME confirming that the corresponding discounts that were applied are correct. [HANDWRITTEN: The supporting documentation was mailed out to FMO today, August 15, 2011, and is currently being reviewed by FMO.]

2. CME is claiming a remaining balance of USD 138,377.32 for two duplicate payments that it allegedly issued; this claim is currently under review pending its approval or rejection.

3. The following invoices billed to CME are pending review:
DNB-242-09 USD 161,045.24  ORT for the Merilla vessel
DNB-352-09 USD 54,785.24  Penalty for the Qlang Sheng vessel

[HANDWRITTEN: 4. CME has a remaining credit balance of 5,000,000.00 USD for a payment issued in December 2009 to the Alcosa OXBOW supplier on behalf of FMO, this will be offset through Iron Ore sales.]

[Signature]                                    [Signature]

6



# TRANSLATION CERTIFICATION

450 7th Avenue
10th Floor
New York, NY 10123
Tel 212.643.8800
Fax 212.643.0005
www.morningtrans.com

County of New York
State of New York

Date: December 2, 2015

To whom it may concern:

This is to certify that the attached translation from Spanish into English is an accurate representation of the documents received by this office.

The documents are designated as:
- Compensation Act FMO-CME USD

Austin Lowe, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of Austin Lowe

Exhibit 2

## Claim for Invoiced Amounts

| Contract | Total Invoices | Accepted Invoices | Outstanding Invoices | Amount Offset | Claim |
|---|---|---|---|---|---|
| TSMC | $ 167,920,099.65 | $ 166,506,201.23 | $ 1,413,898.42 | $ 63,260,167.32 | $ 104,659,932. |
| General Piar Charter | $ 37,719,588.98 | $ 36,840,560.33 | $ 879,028.65 | $ 32,783,548.51 | $ 4,936,040. |
| Wagons Contract | $ 35,002,338.42 | $ 35,000,000.00 | $ (2,338.42) | $ 4,848,848.06 | $ 30,153,490. |
| English Charters | $ 10,559,001.91 | $ 10,256,399.41 | $ 302,602.50 | $ 5,576,503.50 | $ 4,982,498. |
| | | | | | |
| **Total** | $ 251,201,028.96 | $ 248,603,160.97 | $ 2,593,191.15 | $ 106,469,067.39 | **$ 144,731,961.** |

## Claim for Lost Revenues

| Contract | Claim |
|---|---|
| TSMC | $ 107,602,164.13 |
| General Piar Charter | $ 16,488,000.00 |

## Rule B Application Total

| Contract | Invoiced Claim | Lost Revenues | Total |
|---|---|---|---|
| TSMC | $ 104,659,932.33 | $ 107,602,164.13 | $ 212,262,096.46 |
| General Piar Charter | $ 4,936,040.47 | $ 16,488,000.00 | $ 21,424,040.47 |
| English Charters | $ 4,982,498.41 | $ - | $ 4,982,498.41 |
| | | **Total** | **$ 238,668,635.34** |

## Attachment Application Total

| Contract | Invoiced Claim | Lost Revenues | Total |
|---|---|---|---|
| Wagons Contract | $ 30,153,490.36 | $ - | $ 30,153,490.36 |
| | | **Total** | **$ 30,153,490.36** |

**CME's Total Overall Claim Against FMO**  $ 268,822,125.70