# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Michael J. Frevola
(212) 513-3516
michael.frevola@hklaw.com

January 16, 2017

**BY ECF FILING**

Hon. Andrew L. Carter, Jr.
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Room 435
New York, NY 10007

Re:     *Commodities & Minerals Enterprise Ltd. v. CVG Ferrominera Orinoco, C.A.*
        Dkt. # 16-cv-00861(ALC)(HBP)
        Our File:  136961.00005

Honorable Sir:

We represent plaintiff Commodities & Minerals Enterprise Ltd. ("CME") in the referenced matter.  We write to update the Court with regard a recently issued arbitration award relevant to this matter, and to request that the Court temporarily stay any decision with respect to defendant CVG Ferromineara Orinoco, C.A.'s ("FMO") motion to dismiss and/or vacate (Doc. # 38) now pending before the Court.

CME commenced this action against FMO on February 4, 2016, with the filing of its verified complaint seeking a prejudgment attachment of FMO's property in the district pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure ("Rule B").  *See* Doc. #1, ¶¶ 9, 10, 87-94.  CME sought a Rule B attachment to secure claims that CME was commencing against FMO in several arbitrations in different jurisdictions under various different maritime contracts.  *See* Doc. # 1, ¶¶ 87-94.  In particular, CME sought an attachment in aid of arbitration it was commencing under the Transfer System Management Contract dated August 7, 2010 (the "TSMC"), which contract called for arbitration in Miami pursuant to the Rules of the Society of Maritime Arbitrators, Inc. (the "SMA").  Doc. # 1, ¶¶ 9, 88.  CME's claims for damages under the TSMC amount to over $212,000,000.  Doc. # 1, ¶ 64.

Hon. Andrew L. Carter, Jr.
January 16, 2017
Page - 2 -

     This Court issued an order of attachment that same day, Doc. #3, and an amended order of attachment on February 9.  Doc. #11 (collectively, the "Order").  Pursuant to the Order, FMO's New York bank account with garnishee Bank of America (the "Account") was attached.  Upon information and belief, the Account currently has a balance of approximately $7.5 million.  *See* Doc. #85.

     On June 13, 2016, FMO moved this Court for an order dismissing CME's verified complaint and/or vacating the Order.  Doc. #38 (the "Motion").  In support of the Motion, FMO argued, *inter alia*, that it is an agency or instrumentality of the Venezuelan government under the Foreign Sovereign Immunities Act ("FSIA") and, as such, its property (including the Account) is immune from attachment pursuant to 28 U.S.C. § 1609.  Doc. #39, at 16-20.  On September 29, 2016, the Court issued an order (1) finding that FMO is an agency or instrumentality of a foreign state, and (2) directing CME to submit a letter motion containing its argument as to why an exception to the FSIA might apply.  Doc. #83.  Pursuant to that order, CME submitted its letter motion on October 18, 2016.  Doc. #84.  FMO has not filed a reply to CME's letter, and the Motion remains pending before the Court.

     On February 9, 2016, CME commenced arbitration against FMO pursuant to the TSMC's arbitration clause.  CME seeks a final award in the TSMC Arbitration in the aggregate amount of over $227 million.  In that arbitration, CME applied for a partial final award for security for certain portions of its claims, including security in the amount of over $51 million for monthly throughput charges that were due to CME under the TSMC, and which payments were to be made by FMO with no right of deduction or setoff (the "Throughput Claims").  Partial Final Award, at 47-51.[1]  CME's request for security was fully briefed by both parties, and hearings were held on CME's motion in October and November 2016, which hearings were attended and argued by FMO.[2]  Partial Final Award, at 7.

     The arbitrators issued a partial final award dated January 5, 2017 (the "Partial Final Award"), which award grants CME's security for its Throughput Claims.  Pursuant to the Partial Final Award, FMO has been directed to make a deposit in the amount of over $62 million (the amount of CME's Throughput Claims plus accrued interests at 3.25%) in an escrow account to be established by the parties and held by a first-class New York Bank.

---

[1]  A true and correct copy of the TSMC Arbitration Panel's partial final security award dated January 5, 2017 is annexed to this letter as Exhibit A.

[2]  Although the seat of the arbitration is Miami, hearings were held in New York by agreement of the parties and as a matter of convenience only.

Hon. Andrew L. Carter, Jr.
January 16, 2017
Page - 3 -

As of the date of this letter, FMO has not yet posted the required security.  On Friday, January 13, 2017, the undersigned sent an email to counsel representing FMO in the TSMC Arbitration[3] proposing an escrow agreement, and also proposing that the funds currently under attachment in the Account be transferred to a New York escrow account as partial satisfaction of the Partial Final Award.  As of the filling of this letter, FMO has not responded to these proposals.  Tomorrow, January 17, 2017, CME will file in the United States District Court Southern District of Florida a petition to confirm and enforce the Partial Final Award pursuant to the New York Convention[4] and Chapter Two of the Federal Arbitration Act (FAA).[5]  Given these recent developments, a stay of FMO's Motion, which seeks to dismiss and/or vacate the Rule B attachment, would be prudent for the following reasons.

First, the parties may agree to use the funds currently under attachment pursuant to the Order to fund an escrow account in New York.   In this instance, CME and FMO would have to agree to a proposed modification of the Order for the Court's endorsement to allow the funds in the Account to be transferred.  After the transfer, there will no longer be any known property in the district belonging to FMO subject to the Order, rendering the motion essentially moot.  A temporary stay of the Motion will facilitate the parties in reaching such an agreement.

Second, if CME's application to confirm and enforce the Partial Final Award is unopposed, the award will be confirmed and converted to a judgment in short order.  Proceedings to enforce foreign arbitral awards under Chapter Two the FAA are summary in nature.  *Empresa De Telecommunicaciones De Bogota S.A. E.S.P. v. Mercury Telco Group, Inc*., 670 F. Supp. 2d 1357, 1361 (S.D. Fla. 2009).  Once judgment enforcing the Partial Final Award is entered, FMO will no longer have a basis to argue that its property is immune from attachment under the FSIA.  Pursuant to 28 U.S.C. § 1610(a)(6), the property of a foreign state used for a commercial activity in the United States shall not be immune from attachment in aid or execution upon a judgement entered by a court of the United States if "the judgment is based on an order confirming an arbitral award rendered against the foreign state … ."  Thus, it would be prudent and equitable for this Court to stay the Motion until the Southern District of Florida issues a ruling with regard to CME's petition to enforce the Final Partial Award.

---

[3] In the TSMC Arbitration, FMO is represented by the international law firm De Jesus & De Jesus based in Paris, France.

[4] The "New York Convention" refers to The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, as implemented by Chapter Two of the FAA, 9 U.S.C. §§ 201, *et seq.*

[5] CME is filing its petition to confirm and enforce the Partial Final Award in the Southern District of Florida because the TSMC Arbitration is seated in Miami.

Hon. Andrew L. Carter, Jr.
January 16, 2017
Page - 4 -

Finally, if FMO does challenge CME's petition to confirm and enforce the Partial Final Award, FMO will have waived any right to immunity from pre-judgment attachment it may have had under the FSIA, and CME will be entitled to maintain the Rule B attachment pursuant to the New York Convention and Chapter Two of the Federal Arbitration Act ("FAA"). Pursuant to 28 U.S.C. § 1610(d), the property of a foreign state used for a commercial activity in the United States is not immune from attachment prior to the entry of judgment if the foreign state has explicitly waived its immunity from attachment prior to judgment.

Article VI of the New York Convention states, "[i]f an application for the setting aside or suspension of the award has been made to a competent authority … the authority before which the award is sought to be relied upon may … on the application of the party claiming enforcement of the award, order the other party to give suitable security." Article VI explicitly allows courts to impose security requirements on parties seeking to set aside an award. *See International Ins. v. CAJA NAC. De Ahorro Y Ceguro*, 293 F.3d 392, 399-400 (7th Cir. 2002). As such, a foreign state waives its immunity from pre-judgment attachment under the FSIA on behalf of itself and its instrumentalities by entering into the New York Convention. *Id*.

Pursuant to Article VI of the New York Convention, CME will be entitled to pre-judgment security from FMO if FMO opposes CME's application to confirm or enforce the Partial Final Award. *Id*.; *see also Libancell S.A.L. v. The Republic of Lebanon*, No. 06-2765, 2006 WL 1321328, *4 (S.D.N.Y. May 16, 2006). Venezuela is a signatory to the New York Convention and, as such, has explicitly waived FMO's immunity from pre-judgment attachment ordered in compliance with Article VI.

FMO will have 20 days to answer CME's petition to confirm and enforce the Partial Final Award. At that time FMO will have to state its defenses if it is going to seek to set aside or challenge the Partial Final Award. As such, it would be prudent and equitable for this Court to stay decision on the Motion at least until FMO answers CME's petition.

We look forward to receiving Your Honor's decision on the foregoing matter.

Respectfully submitted,
HOLLAND & KNIGHT LLP
By: _/s/ Michael J. Frevola_
Michael J. Frevola

MJF:mf
cc: Chambers (ALCarterNYSDChambers@nysd.uscourts.gov)

# Exhibit 1

In the Matter of the Arbitration

- between -

Commodities & Minerals Enterprise LTD.,

Claimant,

v.

CVG Ferrominera Orinoco, C.A.,

Respondent.

Pursuant to the Transfer System Management Contract dated August 7, 2010

In the Matter of the Arbitration

- between -

Commodities & Minerals Enterprise LTD.,

Claimant,

v.

CVG Ferrominera Orinoco, C.A.,

Respondent.

Pursuant to the M/V *GENERAL PIAR* Charter Party dated January 21, 2010

Before:            A.J. Siciliano
                   George R. Wentz, Jr.
                   John D. Kimball, Chairman

Appearances:       Holland & Knight, LLP
                   Counsel for Commodities & Minerals Enterprise Ltd:
                   by Michael J. Frevola, Esq. and Robert Denig, Esq.

De Jesus & De Jesus
Counsel for CVG Ferrominera Orinoco, C.A:
by Dr. Alfredo De Jesus O. and Eloisa Falcon Lopez, Esq.

**PARTIAL FINAL AWARD GRANTING IN PART AND DENYING IN
PART (1) CLAIMANT'S MOTIONS FOR PARTIAL SECURITY
AND (2) RESPONDENT'S MOTIONS TO DISMISS FOR LACK OF
JURISDICTION**

1.      This matter concerns two separate arbitrations between claimant Commodities &

Minerals Enterprise Ltd. ("CME") and Respondent CVG Ferrominera Orinoco, C.A. ("FMO").

The first arbitration concerns CME's claim against FMO for damages in the amount of

approximately $212,262,096.46, plus interest and attorney's fees, under a Transfer System

Management Contract dated August 7, 2010. ("TSMC Arbitration.")  The TSMC provides for

arbitration in Miami, Florida in accordance with the Rules of the Society of Maritime

Arbitrators. ("SMA.") The second arbitration concerns a claim for approximately

$21,424,040.07, plus interest and attorneys' fees, under a charter party dated January 21, 2010

for the M/V General Piar. ("General Piar Arbitration.")  The M/V General Piar charter party

provides for arbitration in New York in accordance with SMA Rules.[1]

2.      The two arbitrations have not been consolidated, but the parties agreed to hold

consolidated hearings in New York.

3.      Both parties have submitted motions to the Panel.  FMO has moved for a

dismissal on the grounds that the Panel has no jurisdiction of the arbitrations.[2]  We shall refer to

FMO's motion as the "Jurisdiction Motion."

---

[1] There is a dispute among the parties, however, as to which specific contract applies and whether the arbitration
clause is in effect. The dispute is the subject of FMO's Jurisdiction Motion, discussed below.
[2] FMO initially also moved for a stay, but has withdrawn that part of its motion. Tr. 385:23-25.

4.      CME has moved for a partial final award directing FMO to provide partial

security of $103,246,034.00 for its claims in the TSMC arbitration and $4,057,012.00 for its

claims in the M/V General Piar arbitration. We shall refer to CME's motion as the "Security

Motion."

## PROCEDURAL BACKGROUND

5.      On February 9, 2016, Holland & Knight, LLP, as counsel for CME, submitted its

demands for arbitration to FMO and appointed Mr. A. J. Siciliano as arbitrator in both cases.

Previously, on February 4, 2016, CME filed a complaint against FMO in the United States

District Court for the Southern District of New York seeking a Rule B maritime attachment order

which was granted by the Court. ("Rule B case.") George R. Wentz, Jr. was appointed as

arbitrator by FMO in both cases on April 10, 2016. On June 1, 2016, Messrs. Siciliano and

Wentz appointed John D. Kimball to serve as the third arbitrator and chairperson in both cases.

The parties have confirmed their acceptance of the Panel, subject to FMO's reservation of rights

with respect to its position there are no binding arbitration agreements and its intention to file

motions to dismiss the arbitrations.

6.      The arbitrators, counsel for CME and the then counsel for FMO[3] conducted an

initial telephone conference on June 23, 2016 to establish a schedule for future proceedings. The

Panel also directed each party to make a deposit into the escrow account of their counsel to cover

arbitrators' fees and expenses and both parties have done so.  The funds later were transferred to

Blank Rome, LLP to hold as escrow agent.

7.      Based on a schedule accepted by counsel for the parties and approved by the

Panel, on July 1, 2016, CME filed statements of claim in each arbitration. CME also filed a

---

[3] Subsequent to and as a result of the October 26 and 27, 2016 hearings, initial counsel for FMO, Messrs. Diaz, Reus
& Targ LLP, was replaced by Messrs. De Jesus & De Jesus.  All references to counsel for FMO prior to October
26, 2016 are to Messrs. Diaz, Reus & Targ.

memorandum in support of its joint motion for a partial final security award in both arbitrations. On July 22, 2016, FMO filed a demand for a stay or dismissal of the arbitrations based on its contention that the Panel does not have jurisdiction. On August 17, 2016, FMO filed its opposition to CME's security motions. On September 2, 2016, CME filed its opposition to FMO's jurisdiction motion.  On September 16, 2016, CME filed a reply in support of its security motions. On October 12, 2016, FMO filed a reply in support of its motions for a dismissal or stay of the arbitrations. On October 26, 27 and November 7, 2016, the Panel conducted hearings for oral argument with respect to the pending motions and to verify the claim of Messrs. De Jesus & De Jesus that the Diaz, Reus & Targ no longer represented FMO and that it is now counsel for FMO in all matters related to the arbitrations and court actions initiated in New York by CME. By agreement among the parties and subject to FMO's ongoing reservation of rights, the hearings were held in New York at the offices of Blank Rome, LLP.

8.      The Panel issued a partial final award on November 12, 2016 concerning an award of fees and expenses for the hearing on October 26, 2016. FMO has confirmed its compliance with the partial final award.

9.      The Panel has carefully reviewed the voluminous motion papers and exhibits submitted by the parties concerning the motions. The Panel also has considered the additional documentary evidence and arguments submitted during oral argument on October 26, 27, and November 7, 2016. The Panel also has deliberated in order to thoroughly consider the submissions of both sides.

10.     During the hearing on November 7, 2016, counsel for FMO requested an opportunity to submit additional documentation in support of his contention that the Panel does not have jurisdiction because the TSMC and M/V General Piar charter were procured as a result

4

of corruption and the arbitration agreements, therefore, are invalid. It was agreed that the additional documentation would be submitted within two weeks. In subsequent communications, counsel for FMO requested additional time to make has submissions and finally did so on December 20, 2016. Counsel for CME has submitted written responses to FMO's additional submissions. The Panel has taken this additional information into account in our deliberations and the preparation of this partial final award,

## FACTUAL BACKGROUND

11.    The factual background to these arbitrations is extensive and complex.

12.    CME is a British Virgin Islands entity and is in the business of trading commodities and minerals, particularly iron ore.

13.    According to FMO, it is a company organized and existing under the laws of the Bolivarian Republic of Venezuela and is, and always has been, an organ of the Venezuelan State. FMO's prior counsel has described it in the following way:

> [FMO] is a Functionally Decentralized entity operating as a business created by the Venezuelan State at the end of 1975, aimed at developing the constitutional and legal monopoly of the iron ore exploitation industry on behalf of the State. The stated purposes of FMO is to manage iron production for the government across the entire country in conformity with the guidelines of the Ministry of the Popular Power of Basic Industry and Mining (*Ministerio de Industrias Basicas y Mineria*) and in furtherance of a presidential mandate. As an organ of Venezuela that was granted the right to mine and export iron ore—one of the country's important government-owned natural resources—FMO has a responsibility to protect and maintain the revenue of the country.[4]

14.    FMO's Transfer System is the means by which it delivers iron ore mined in the interior of Venezuela to large bulk carrier vessels, which then transport the iron ore to FMO's customers around the world.

---

[4] FMO's Response in Opposition to Claimant's Joint Application for a Partial Final Award for Security, pgs. 1-2 (internal citations omitted).

15.     Iron ore is transported from FMO's mines to Puerto Ordaz and Palua ("Inland Ports"), which are inland ports approximately 180 miles up the Orinoco River.  FMO uses Panamax and Handymax size ships as "shuttle vessels" to transport the ore from the inland ports to an offshore transfer station located in deep water off the Venezuelan coast.  The offshore transfer station is a converted self-unloading vessel named the *"M/V BOCA GRANDE II,"* which is permanently moored several miles off the mouth of the Orinoco River in Venezuelan waters. The *M/V BOCA GRANDE II* is commonly called the "Transfer Station" because of the role it plays in the Transfer System.  Large bulk carrier ships then load iron ore cargoes directly from the Transfer Station.

16.     At all relevant times, FMO owned all of the components of the Transfer System, which consisted of: (1) the Transfer Station, (2) two shuttle vessels, the *M/V RIO CARONI* and the *M/V RIO ORINOCO,* (3) a ship loader and conveyor system that transported the iron ore from the stockpile to shuttle vessels, and (4) the Punta Barima pilot station.  On occasion as needed, FMO also would charter additional shuttle vessels to operate as part of the Transfer System.

17.     In 2004, CME entered into a contract with FMO for the sale and purchase of Venezuelan iron ore (the "2004 Iron Ore Sales Contract"), whereby FMO agreed to sell to CME certain quantities of various iron ore products for the period from January 2005 through December 2009.  Under that contract, FMO was to deliver iron ore to CME at Puerto Ordaz, the Transfer Station, or by transshipment in Venezuelan waters, at which point the iron ore would be loaded on board ships for delivery to CME's customers.

18.     In January 2009, CME entered into an agreement with CVG (the "Framework Agreement") whereby both parties agreed to take certain action necessary to reactivate

6

production from the Cerro Bolivar mine.  Under the terms of the Framework Agreement, in

return for CME's investment to reopen the Cerro Bolivar mine, CVG guaranteed that CME

would receive from FMO up to three million metric tons of iron ore per year for each year of the

Framework Agreement's ten-year term, or a total of thirty million metric tons of iron ore.

19.     In August 2010, CME and FMO entered into the TSMC. Under the TSMC, CME

was to maintain, manage, and operate the Transfer System for FMO for 5 years, to be

automatically renewed for an additional period of 5 years unless terminated by either party.  The

TSMC put responsibility on CME for several operations, including: (a) loading the shuttle

vessels at the Inland Ports, (b) transporting the iron ore in the shuttle vessels from the inland

ports to the Transfer Station offshore, (c) the operation and maintenance of the Punta Barima

pilot station, (d) the transshipment of the iron ore from the shuttle vessels to the Transfer Station,

and (e) loading the iron ore from the Transfer Station into the large bulk carriers for overseas

transport. The TMSC called for a minimum throughput of 6,000,000 metric tons of iron ore

from FMO's mines for each calendar year for an initial period of 5 years.

20.     Under the TSMC, CME was to receive compensation from FMO based on a

processing rate of a minimum of 500,000 metric tons of iron ore per month, which payments

would be made in accordance with the existing 2004 Iron Ore Sales Contract.  CME was to

invoice FMO at the beginning of each month in advance in a sum equal to processing 500,000

metric tons of iron ore at an agreed-upon rate under the TSMC.

21.     In December 2010, CME and FMO entered into a Commercial Alliance

Agreement ("CAA.")  The parties are in disagreement as to the purpose and intent of the CAA.

FMO contends, *inter alia,* that one of the aims of the CAA was to "subsume" all underlying

"development contracts," such as the TSMC and M/V General Piar charter.  FMO contends that

7

post CAA, FMO and CME operated as a general partnership making it impossible for any particular invoice issued by CME to be credited to any particular "development contract," as CME attempts to do in these arbitrations. CME contends, *inter alia*, that the purpose of the CAA was to provide the financial support FMO needed to reactivate the Cerro Bolivar mine by including financing construction projects, acquiring assets, and rendering services that would facilitate FMO's production and supply of the iron ore. CME further contends the CAA was intended to complement the provisions of the Framework Agreement and, under the CAA, CME and FMO were to enter into separate "development contracts" for those projects and services required to support FMO's ongoing operations. CME asserts that these "development contracts" stand alone, were not subsumed into the CAA, and are therefore individually enforceable.

22.    In May 2012, CME and FMO entered into a second iron ore sales agreement (the "2012 Iron Ore Sales Agreement"), pursuant to which FMO agreed to sell and deliver to CME certain specified amounts of designated iron ore products.

23.    In July 2012, CME and FMO entered into a contract for the sale and purchase of a number of railway wagons (hopper railcars) for the transportation of FMO's iron ore. ("Wagons Contract."). Disputes concerning this contract are the subject of a separate proceeding, as are disputes arising under a series of charter parties other than those which concern the MV General Piar.

24.    CME contends that over time, the CME/FMO relationship evolved into an alliance whereby CME would provide various forms of financing, goods, and services for the cash-poor FMO, in return for which CME would receive a predetermined U.S. dollar cash equivalent in iron ore products. According to CME, it would invoice FMO for services it provided under the various contracts described above, and FMO would invoice CME for the iron

ore products thus produced and provided to CME.  CME alleges that if the system had worked as contemplated by the parties, the total amount of CME's invoices owed by FMO would equate or be in close balance with the total amount of FMO's invoices owed by CME.

25.     According to CME, as of 2010 onwards, however, FMO never provided CME with any iron ore as a specific payment against any of CME's invoices.

26.     CME contends the total amount of its invoices for amounts owed by FMO far exceeded the total amount of FMO's invoices owed by it to FMO.  However, FMO denies this is the case.

27.     CME further argues that, in 2011, the difference between the parties' respective financial positions worsened. According to CME, the amount of iron ore FMO provided to CME on a monthly basis began to decrease substantially, creating a financial imbalance between the parties.

28.     Beginning in August 2011, the parties participated in a formal reconciliation process that produced a Reconciliation Statement of their accounts (the "Reconciliation Statement").  The Reconciliation Statement listed all outstanding invoices issued by FMO as of December 31, 2010 and showed an outstanding final balance of $1,572,474.52 owed by FMO to CME.  CME and FMO signed the Reconciliation Statement, which included a note of "observations" listing transactions that had been omitted from the statement.  The parties dispute the impact of the Reconciliation Statement on the claims.

29.     CME contends FMO currently owes it for services already provided under the TSMC and other contracts a _**net**_ amount of $212,262.096.46, which, together with interest, totals $227,059,096.46.  According to CME, it has credited FMO for the value of iron ore products it

received against amounts FMO owes CME for the goods and services that CME provided. FMO denies any amount is owed to CME.

30.     There are significant factual disputes as to subsequent events.  According to CME, after the death of President Hugo Chaves in March 2013, there was considerable unrest and uncertainty in the Venezuelan government and Venezuelan markets. CME asserts that, in an effort to address the extraordinary economic difficulties facing the Venezuelan government, President Maduro sought means by which Venezuelan state-owned companies and their subsidiaries could avoid or lessen their financial commitments to non-government entities, and, in particular, foreign entities like CME.  CME further asserts that, as part of a broad plan to implement this policy, in 2013 FMO's parent company, CVG, which corporation is wholly owned by the Venezuelan government, appointed as president of FMO a high ranking, active duty officer in the Venezuelan military, General Jesus Manual Zambrano Mata.  CME claims it repeatedly attempted to open a dialogue with FMO's new management regarding the amount of its outstanding claims, but that FMO seemed intent to retroactively rewrite the terms of its agreements with CME, including the TSMC. CME alleges that when it would not agree to FMO's new terms, FMO took the position that all of CME's contracts violated Venezuelan law and stopped supplying iron ore to CME.

31.     In August 2013, CME commenced an action in Venezuela's Fifth Superior Administrative Court of the Capital Region (the "Administrative Court") to obtain a declaratory judgment from that court that the CME/FMO contracts did not violate Venezuelan law.

32.     CME contends that in response to its efforts to obtain payment for CME's outstanding invoices, and in an attempt to discredit and intimidate CME, FMO made criminal accusations against the directors and management of CME.  Subsequently, according to CME,

FMO caused an arrest proceeding to be instituted against CME's chairman, Tyrone Serrao, alleging that he had engaged in criminal activities that damaged the patrimony of Venezuela. FMO alleges that not only is CME guilty of criminal behavior, but that the arrest warrant for Mr. Serrao remains in force. According to FMO, corruption was involved in all of CME's contractual relationships with FMO, thereby invalidating them.

33.    In December 2013, the Venezuelan Administrative Court ordered an audit of the parties' relationship be conducted, to include both a legal audit and a financial audit; the latter being performed in the presence of a representative of the Venezuelan Attorney General's office. The parties are in major disagreement about the audit process and the results of the audit.

34.    On August 5, 2015, the Venezuelan Administrative Court issued a decision, holding that: (a) it had subject matter jurisdiction over CME's application; (b) the CME/FMO contracts "were executed in compliance with laws" and; (c) the CME/FMO contracts "do not violate or were not executed in violation of the foreign exchange laws then in effect . . . and, therefore can be subject to payment by offsetting iron ore." FMO is appealing.

35.    On October 10, 2016, the Bolivarian Republic of Venezuela Supreme Court of Justice dismissed an action brought by FMO against CME for a declaration that the arbitration clauses in the TSMC and M/V General Piar Charter cannot be enforced. According to CME, it was never served with process in this case and never appeared in the action. FMO is appealing.

36.    Given the clear disputes between the parties concerning key factual issues as noted above, the Panel considers it premature to make any detailed findings of fact. It will be necessary for hearings to be held with testimony from witnesses with personal knowledge of the facts. Based on the extensive body of evidence presented, however, the Panel is prepared to issue the unanimous rulings set out below with respect to the pending motions.

## TSMC ARBITRATION

37.     The undisputed evidence shows the parties entered into the TSMC as of August 7,

2010.

38.     The undisputed evidence further shows the TSMC contained the following

arbitration agreement in clause 41:

> 41.     Arbitration
>
> The Parties hereby expressly declare their Contract to submit to
> binding arbitration any and all controversies arising from, or in any
> way related to, this Contract and/or the execution and/or
> interpretation thereof, including, but not limited to, the validity
> and/or enforceability of this clause; and consequently further
> expressly waive their right to submit any such controversies to the
> jurisdiction of the Courts of any State/Country, including
> expressly, but not limited to, the jurisdiction of the Venezuelan
> Courts, as allowed by the Venezuelan Commercial Arbitration Act
> and any other applicable Venezuelan laws.  The parties further
> declare that this Contract has been negotiated at arm's length and
> in no way may be construed as a contract of adhesion for neither of
> them.  Should a controversy arise that, by virtue of any applicable
> legislation, may not be submitted to arbitration, then only that
> controversy, and no other, may be submitted to the Courts having
> jurisdiction.
>
> Arbitration shall be conducted in Miami, Florida, in accordance
> with the Rules of the Society of Maritime Arbitrators then in force,
> in the English language.  The arbitration shall be exclusive and
> mandatory.  The following procedure shall be followed for the
> appointment of arbitrators:
>
> (i)  The arbitration panel shall consist of three arbitrators, one to be
> appointed by each of the parties hereto and the third by the two
> so chosen.  The Arbitrators shall be experienced in both
> commercial and maritime law.  Either party may initiate the
> arbitration as provided in the Rules of the Society of Maritime
> Arbitrators.  The Arbitrators shall apply the General Maritime
> Law of the United States of America as the substantive law.
>
> Their decision shall be final and binding for the parties as
> though it were the final and unappealable decision of a Court
> of competent jurisdiction.  The Arbitration Panel shall have the

> authority to order any and all preventive measures as it deems
> fit, and either party shall be entitled to present such order to
> any competent Court for its enforcement. The Arbitrators shall
> also have the authority to certify copies of any and all
> documents submitted to them and/or orders issued by them.
> The award shall be reasoned and shall set forth findings of fact
> and conclusions of law. The award shall include interest at the
> prime rate of interest announced publicly by the Wall street
> Journal (or its successors) as the so-called "prime rate."
>
> The prevailing party shall recover all attorney's fees and costs
> from the other party.

39.     Although FMO has asserted several defenses to CME's claim, the Panel

unanimously decides that it is authorized under clause 41 of the TSMC to determine the scope of

its jurisdiction to hear and decide CME's claims, and to also grant an award of security in aid of

arbitration should we decide that is justified and appropriate to the known facts of this case.

40.     In particular, clause 41 of the TSMC authorizes the Panel "to order any and all

preventive measures as it deems fit...."

41.     SMA Rule 30 is applicable under Clause 41 and provides: "The Panel, in its

award, shall grant any remedy or relief which it deems just and equitable...."

42.     Numerous court decisions applying the general maritime law of the United States

support the authority of the Panel to grant an award of security. *See, e.g., Sperry Int'l Trade, Inc.*

*v. Gov't of Israel*, 689 F.2d 301, 306 (2d Cir. 1982), *Compania Chilena de Navegacion*

*Interoceanica, S.A. v. Norton Lilly & Co., Inc.*, 652 F. Supp. 1521 (S.D.N.Y. 1987); *In re*

*Arbitration Between Konkar Maritime Enters., S.A. v. Compagnie Belge D'Affretement*, 668 F.

Supp. 267 (S.D.N.Y. 1987); and *British Ins. Co. v. Water St. Ins. Co.*, 93 F. Supp. 2d 506, 516

(S.D.N.Y. 2000).

43.     Awards of security have also been granted by numerous arbitration panels

applying the general maritime law of the United States. See, e.g., *The Mustafa Nevzet*, SMA

3784 (2003); *The Samho Dream*, SMA 4154 (2011); and *Sanko Steamship, Ltd. v. Sherwin Alumina Ltd.*, SMA 4135 (2011).

44.      We are in agreement with other arbitration panels which have held that an award of security should be granted only when there has been a strong showing that a claim is likely to succeed on the merits and enforcement of an eventual judgment will be difficult. We also are in agreement with arbitration awards which have noted that ordering security is an act which arbitrators should approach with caution and consideration of the potential impact on the respondent. We consider that we have taken these points into account in our deliberations in this matter.

45.      For the reasons discussed below, the Panel hereby grants CME's motions in part and defers them in part, and orders FMO to establish pre-judgment security in favor of CME in the amount of $51,104,097.75 with respect to the TSMC claims. In addition to the principal amount of the claims, pre-judgment interest shall be added at the annual rate of 3.25%, which totals $11,626,181.23 over the period in question.  The total amount to be deposited in escrow by FMO is $62,730,279.98. The security shall be in the form of a cash deposit to be held by a first-class New York bank which shall act as an independent third-party escrow agent on the terms and conditions outlined below.

46.      FMO has asserted numerous defenses to CME's claims, as to which it will have a full and fair opportunity to present evidence at future hearings which the Panel is prepared to hold as soon as possible. These include the following defenses which were very ably presented by FMO's counsel in their pre-hearing written submissions and during oral argument at the hearing on November 7, 2016 and in subsequent written submissions:

      a.   The arbitration clause is illegal because it is the product of fraud and corruption;

b.  The arbitration clause was entered into in violation of Venezuelan law. More specifically, FMO contends the arbitration agreement violates Article 4 of the Venezuelan Commercial Arbitration Law; Article 40 of the International Private Law; Article 5 of the Organic Law of the Office of the Solicitor General for the Republic of Venezuela; and Article 21 of the Partial Reform Law of the Statute for the Development of Guayana;

c.  The CAA subsumed the TSMC and retroactively cancelled the arbitration agreement contained therein;

d.  CME waived its rights under the arbitration agreement because of its conduct before the Venezuelan Courts;

e.  CME has not shown a likelihood of success on the merits;

f.  an award of security would be inconsistent with maintaining the status quo; would cause unjustified financial hardship to FMO; and would be frivolous and highly speculative;

g.  the amount of security requested by CME is unprecedented; and

h.  the relief sought by CME is barred by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1609.

47.     Having weighed the evidence and legal arguments presented by both sides, the Panel unanimously decides that CME is entitled to partial pre-judgment security for its claims in the amount of $62,730,279.98.

48.     Under the TSMC, FMO was obligated to make eight monthly payments to CME for throughput charges of   $3,115,000, plus an additional eight monthly payments of $3,190,000 and, lastly, one payment of $734,137.16.

49.     The total amount claimed by TSMC for the throughput charges is $51,104,097.75, plus interest.

50.     CME contends this amount was earned with no right of deduction or offset by FMO as set forth in clauses 12, 14 and 17 of the TSMC.

51.     The evidence presented to the Panel establishes that the throughput amounts were to be paid monthly in the form of deliveries of iron ore and, under clauses 12, 14 and 17 of the TSMC, FMO had no right to make any deductions from these monthly payments while the contract remained in force.

52.     Notwithstanding FMO's affirmative defenses to CME's claims, the Panel has concluded that it has jurisdiction to order FMO to provide pre-judgment security to CME.

53.     With regard to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1609, in our view the FSIA does not apply in arbitration and does not bar an arbitration panel from ordering an agency of a foreign sovereign to post pre-judgment security. Thus, even if the Panel ultimately determines that FMO is an agency of a foreign sovereign, we consider that FMO is not immune from an order directing it to post pre-judgment security for CME's claims.

54.     The United States Court of Appeals for the Second Circuit held in *Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir. 2003) that the FSIA "sets forth the sole and exclusive standards to be used for resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States." That holding, however, does not preclude an arbitration panel from ordering a foreign sovereign to provide pre-judgment security. Moreover, to the extent the FSIA may be applicable in an arbitration, we find that FMO's acceptance of the arbitration agreement in the TSMC constitutes a waiver of immunity from pre-judgment attachment under the FSIA.

16

55.     The Panel has reviewed the additional documentation submitted by FMO's counsel on December 20, 2016, which it contends is evidence of corruption in the dealings between CME and FMO such that the contracts at issue are void ab initio, and thus the panel has no jurisdiction over this matter. FMO's allegations concerning corruption are very serious and the Panel has given them very careful consideration. However, although the FMO documentation does appear to support certain allegations of wrongdoing by former officers of FMO, we find the evidence submitted to date insufficient to support FMO's assertion that the contracts at issue were procured by fraud. More importantly, the evidence currently before us clearly falls short of showing that the TSMC arbitration clause itself was fraudulently procured. Absent such evidence, U.S. law treats the arbitration clause as separable from the remaining provisions of the contract. See, Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395 (1967). Thus, under a broadly worded arbitration clause such as that contained in the TSMC, it falls upon the arbitrators to decide if and to what extent "fraud in the inducement" or otherwise impacts the parties' respective contract claims. At this time, we do not consider the FMO documentation to be sufficient to undo the Panel's jurisdiction or its authority to issue this Partial Final Award. That said, the Panel wishes to emphasize that FMO will be given a full and fair opportunity to further develop its "corruption" defense and to offer any additional evidence it wishes to have us consider on this important point, including the testimony of witnesses from CME and FMO.

56.     The Panel is satisfied that CME has made an adequate showing that it is likely to prevail on the merits with respect to its throughput claims in the amount of $51,104,097.75, plus interest, to justify an award of partial pre-judgment security. Thus far, FMO has not made a convincing showing that it has viable grounds for disputing CME's invoices for the throughput claims or has a right of set-off with respect to those specific payments.

17

57.     The Panel has carefully considered FMO's contention that awarding CME security will cause it severe financial hardship and upset the status quo between the parties. In our view, however, the difficulty CME is likely to face in enforcing an eventual final award and the considerable financial hardships it would encounter if the award cannot be enforced weigh heavily in favor of awarding pre-judgment security. We have taken note of the fact, among other things, that FMO was obligated under the TSMC to establish and replenish on-going escrow funds, but has not done so.

58.     The Panel also is conscious that the amount of security we are directing FMO to post is very substantial. But the total claims at issue in these arbitrations are of a much greater amount and, at this stage, we are only ordering FMO to provide security for CME's throughput claims.

59.     The Panel declines at this stage to order FMO to provide pre-judgment security for CME's other claims. The Panel is prepared to conduct evidentiary hearings at the earliest possible dates to hear and decide CME's remaining claims.

60.     For the avoidance of any doubt, we emphasize that this partial final award does not constitute a decision that CME has successfully proved any if its claims under the TMSC or that we are denying any of FMO's affirmative defenses.  On the contrary, at this stage we only are awarding pre-judgment security for CME's claims under the TMSC and the burden remains with CME to prove those claims by a preponderance of the evidence and to disprove or overcome the defenses advanced by FMO.

## M/V GENERAL PIAR CHARTER PARTY

61.     At this stage of the proceedings, the Panel declines to award pre-judgement security to CME with respect to its claims under the charter party for the M/V General Piar.

18

62.    It is undisputed the parties entered into a charter party for the M/V General Piar.

Nor is it disputed that the vessel was used to transport iron ore as a shuttle vessel in FMO's

Transfer System.

63.    CMI contends it performed all of its obligations under the charter party. FMO,

however, denies this contention and argues the charter party violates Venezuelan law.

64.    CME contends the parties entered into an initial charter for the M/V General Piar

dated January 10, 2010 which contained the following arbitration clause:

> Time Charter Contract (GENERAL PIAR) (FMO's version)
> General average/Arbitration in New York USA. International Maritime
> Law to Apply
>
> All disputes arising out of this contract shall be arbitrated in New York,
> USA, and unless the parties agree forthwith on a single arbitrator, be
> referred to the final arbitrament of two arbitrators carrying on business in
> New York, USA, who shall be members of the Baltic Mercantile &
> Shipping Exchange and engaged in shipping, one to be appointed by each
> of the parties with power to such arbitrators to appoint an umpire. No
> Award shall be questioned or invalidated on the grounds that any of the
> arbitrators are not qualified as above, unless objection to his action be
> taken before the award is made.
>
> Any dispute arising hereunder shall be governed by International Maritime
> Law.
>
> For disputes where the total amount claimed by either party does not
> exceed USD 50,000, the arbitration shall be conducted in accordance with
> the small claims procedure of the International Maritime Arbitrators
> Association.

65.    CME further contends this initial charter party was subsequently voided by the

parties and replaced by another charter party for the M/V General Piar which contained the

following arbitration agreement:

> Time Charter Contract (GENERAL PIAR) (CME's version)
>
> In cases where neither the claim nor any counterclaim exceeds the sum of
> US$50.000 (or such other sum as the parties may agree) the arbitration

19

shall be conducted in accordance with the LMAA small claims procedure current at the time when the arbitration proceeding are commenced.

This charter shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this contract shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgment may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.

In cases where neither the claim nor any counterclaim exceeds the sum of US$50.000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the shortened arbitration procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced.

66.     FMO denies the initial charter party for the M/V General Piar was voided and further raises all of the same defenses it has asserted with respect to CME's claims under the TSMC which are outlined above.

67.     CME, however, contends that based upon the wording of the arbitration clauses, the parties did not agree to submit issues of arbitrability to the Panel. Therefore, CME argues this Panel has no authority to determine its own jurisdiction under either version of the M/V General Piar charter party. In this respect, CME's position concerning the M/V/General Piar charter party differs from its stance with respect to its claims under the TSMC.

68.     CME nonetheless contends the Panel has jurisdiction to order FMO to provide partial pre-judgment security for its claims in the amount of $4,057,011. According to CME, FMO has accepted invoices in the amount of approximately $37,000,000, whereas FMO has set-off approximately $33,000,000 for its own invoices, leaving a balance of $4,057,011 of what CME claims are "accepted invoices."

20

69.     FMO, however, disputes these contentions and denies that it has accepted any balance or amount as due to CME.

70.     In view of the respective positions of the parties, the Panel is of the view that it is premature to make a decision concerning CME's motion for partial pre-judgement security for its claims arising under either or both versions of the M/V General Piar charter party.

71.     The Panel is prepared to hold evidentiary hearings at the earliest possible date in order to hear and decide CME's claims under either or both versions of M/V General Piar charter party, as well as any counter-claims which FMO may assert. The Panel defers ruling on the parties' affirmative claims for attorneys' fees and expenses until after it has heard and decided the parties' claims on the merits.

## AWARD

72.     CME's motion for partial pre-judgment security under the TSMC is hereby granted in part. FMO is ordered to make a deposit in the amount of $62,730,279.98 in an escrow account to be established by the parties and held by a first-class New York bank which shall act as escrow agent and must irrevocably agree to abide by the orders of the Panel or the United States District Court for the Southern District of New York concerning payment of the funds so held. The Panel shall designate an independent escrow agent in the absence of agreement between CME and FMO. The escrow deposit shall serve solely as pre-judgement security for CME's invoiced non-reducible throughput claims under the TSMC, subject to the further orders of the Panel or the United States District Court for the Southern District of New York.

73.     The parties shall report to the Panel within thirty (30) days of the date of this award concerning the appointment of an independent escrow agent to hold the security hereby

awarded.  All fees and expenses of the escrow agent shall be shared 50/50 by CME and FMO pending the issuance of the Panel's final award, which may apportion those fees differently.

74.     CME's joint motion for additional partial security is hereby deferred for further consideration until after further evidentiary hearings have been held.

75.     FMO's motions to dismiss with respect to CME's claims under the TSMC and M/V General Piar charter are hereby deferred until after further evidentiary hearings have been held.

76.     This partial final award may be confirmed by the United States District Court for the Southern District of New York or any other court which may have jurisdiction.

Dated: January 5, 2017

_____
A. J. Siciliano

_____
George R. Wentz, Jr.

_____
John D. Kimball, Chairman